**2021 UT 23**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

In the matter of THE ESTATE OF D.A. OSGUTHORPE, D.V.M.

STEPHEN A. OSGUTHORPE, THE DR. D.A. OSGUTHORPE TRUST,
JERRY S. OSGUTHORPE, SUE ANN LARSEN, and KAREN BROWN,
*Appellants,*

*v.*

DAVID R. RUDD and BALLARD SPAHR, LLP,
*Appellees.*

No. 20180686
Heard October 13, 2020
Filed July 1, 2021

On Direct Appeal

Third District, Salt Lake
The Honorable Paul B. Parker
The Honorable Robin Reese
Nos. 093901114, 130902503

Attorneys:

Peggy A. Tomsic, James E. Magleby, Christine T. Greenwood,
Jennifer Fraser Parrish, Salt Lake City, for appellants

Mark R. Gaylord, Jonathan O. Hafen, Jenifer L. Tomchak,
Salt Lake City, for appellees

JUSTICE PEARCE authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUSTICE PETERSEN joined.

JUSTICE PEARCE, opinion of the Court:

### INTRODUCTION

¶1  Dr. D.A. Osguthorpe (Dr. Osguthorpe) passed away in 2009, leaving behind significant assets. Dr. Osguthorpe also left behind multiple versions of his will and trust documents. A dozen years after his death, his now-adult children (Osguthorpe Children or

Children) are embroiled in a legal battle with David R. Rudd—the nephew of Dr. Osguthorpe's second wife (June). Rudd is an attorney who had represented June and Dr. Osguthorpe in various matters. The Osguthorpe Children also assert claims against Ballard Spahr, LLP (Ballard), the law firm where Rudd was a partner.

¶2 At the heart of this dispute are the Osguthorpe Children's allegations that Rudd and Ballard (Rudd/Ballard) improperly influenced Dr. Osguthorpe to amend his will and trust in a manner that shifted a portion of the Children's expected inheritance to June and to Dr. Osguthorpe's alma mater. The Osguthorpe Children also allege that Rudd/Ballard engaged in improper and/or misleading conduct which resulted in one of Dr. Osguthorpe's sons losing co-ownership of the land on which his house stood. The Osguthorpe Children further allege that, following Dr. Osguthorpe's death, Rudd/Ballard mishandled estate assets. And they claim that Rudd and June improperly removed assets from Dr. Osguthorpe's estate (Estate).

¶3 After years of litigation, three of the district court's orders are before us. The Osguthorpe Children first appeal the district court's order granting Rudd/Ballard's motion to dismiss the Children's claim for intentional interference with inheritance. The Osguthorpe Children contend the district court erred by declining to recognize the tort and by dismissing their claim on the alternative ground that, even if the tort were a valid cause of action in Utah, the probate proceeding would resolve all of their complaints.

¶4 The Osguthorpe Children next maintain that the district court erroneously granted summary judgment on several other tort claims they wanted to assert on behalf of Dr. Osguthorpe's Estate. The Osguthorpe Children assert that the district court erroneously denied their motion to have the Estate's claims assigned to them after the Estate's court-appointed special fiduciary declined to pursue the claims on behalf of the Estate.

¶5 The Osguthorpe Children lastly aver that the district court improperly granted a motion *in limine* that prevented them from impeaching Rudd with statements Rudd had made in support of his motion to set aside a settlement agreement. The district court excluded those statements as a "reference to the parties' mediation," which the court concluded was inadmissible under rules 401, 402, 403, and 408 of the Utah Rules of Evidence and Utah Code section 78B-10-104.

¶6   We first conclude that, under certain circumstances, a party can assert a claim for intentional interference with inheritance and we therefore reverse the district court's dismissal of that claim. We affirm the district court's decision to not assign the Estate's claims to the Osguthorpe Children. But we take the opportunity to clarify the law that underlies the district court's decision. Finally, we reverse the district court's grant of the motion *in limine*. We remand for additional proceedings.

## BACKGROUND[1]

### *Dr. Osguthorpe's Family and Property History*

¶7   Dr. Osguthorpe passed away in 2009. He was survived by his four adult children from his first marriage: Stephen A. Osguthorpe (Stephen), Jerry S. Osguthorpe (Jerry), Sue Ann Larsen (Sue Ann), and Karen Brown (Karen) (collectively, Osguthorpe Children or Children). His second wife of nearly two decades, June Osguthorpe (June), also outlived him.

¶8   Dr. Osguthorpe was a veterinarian, educated at Colorado State University (CSU). Dr. Osguthorpe and his first wife, Afton, acquired significant assets, including hundreds of acres of land throughout Utah. The Osguthorpe's used much of this land for ranching and agricultural businesses. Dr. Osguthorpe held some of these properties directly, while some of his business entities owned others. A trust established in Afton's name (Afton Trust) held a number of other properties.

¶9   The Osguthorpe's held extensive acreage in Summit County, including a 19-acre parcel in Park City (19 Acres) that was primarily used for crop cultivation. Stephen's home sits on part of the 19 Acres.

¶10   The Osguthorpe Children claim that from an early age they contributed their efforts at "well below market rates" to the family ranching and agricultural businesses, as well as to Dr. Osguthorpe's veterinary practice. The Osguthorpe Children allege Dr. Osguthorpe

---

[1] We are asked to review three district court decisions, first on a motion to dismiss, next on a motion for summary judgment, and third on a motion *in limine*. To review the first two, we view the facts in the light most favorable to the non-moving party. *See Oakwood Vill. LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 9, 104 P.3d 1226; *McBroom v. Child*, 2016 UT 38, ¶ 18, 392 P.3d 835. For the purposes of this opinion, we recite the facts in that light as well.

"repeatedly assured" them that, upon his death, he would give them the family businesses and real property upon which those businesses operate, to reward the Children's "extensive efforts and contributions."

¶11  Afton passed away in 1989. Dr. Osguthorpe married June in 1992. They signed a prenuptial agreement that acknowledged their individual assets and agreed to keep separate their current and future properties. June's nephew-by-marriage, Rudd, represented June in the prenuptial negotiations. June has three adult children from a previous marriage.

*Dr. Osguthorpe's 1998 Estate Plan*

¶12 Dr. Osguthorpe amended his will and trust documents multiple times. Central to this dispute are amendments made in 1998, 2006, and 2008.

¶13  The Osguthorpe Children allege that, even after September 2008, their father continued to assure them that "his and June's assets remained separate and that his estate plan provided that June would not receive any significant assets of [his] upon his death." The estate plan that the Osguthorpe Children contend reflects Dr. Osguthorpe's "intentions and his oft-repeated promises to [Stephen] and Jerry" is the plan from 1998. This plan involved a will (1998 Will) and trust entitled "the Dr. D.A. Osguthorpe Trust" (1998 Trust) (collectively, 1998 Estate Plan).

¶14  The 1998 Estate Plan designates the Osguthorpe Children as joint personal representatives under the 1998 Will and joint successor-trustees under the 1998 Trust. The 1998 Will devised to the Osguthorpe Children Dr. Osguthorpe's tangible personal property that was not otherwise used in a business or trade. The 1998 Will also devised Dr. Osguthorpe's residual property to the Trust. As for June, she was "not to receive any assets under [the 1998] Will but shall receive assets pursuant to . . . [the 1998] Trust."

¶15  The 1998 Trust was revocable. It existed for the "primary benefit" of Dr. Osguthorpe during his lifetime, and designated June and the Osguthorpe Children as the beneficiaries upon Dr. Osguthorpe's death. The 1998 Trust entitled June to annual payments of up to $50,000.

¶16  The 1998 Trust divided shares of its remaining property to the Osguthorpe Children. The 1998 Trust also provided that "[t]he Trustees shall hold, in Trust, all ranch and agricultural property located in Summit County . . . owned by the Trust . . ., to be used by [the Osguthorpe Children] for their benefit in the same manner and

to the same extent as the property has been used in the past." Further, the 1998 Trust specifically gave Stephen and Jerry "the right to continue to use the agricultural property to raise and maintain cattle and to operate a ranch on the agricultural property in the same manner as they have in the past." The 1998 Trust also provided that Stephen's share would include the two acres upon which his current residence is located.

*The 2006 and 2008 Estate Plan Amendments*

¶17 In 2006, Dr. Osguthorpe amended his will (2006 Will) and trust (2006 Trust) (collectively, 2006 Estate Plan). Among the changes the Osguthorpe Children highlight are that the 2006 Trust changed the gift to June from an annual $50,000 distribution to a one-time $1 million gift, to be paid to June in cash or other assets from the Trust's Summit County properties.[2] The 2006 Trust also added a $12 million cash gift to CSU Foundation (CSUF),[3] to be paid by liquidating properties in Summit County.

¶18 The 2006 Trust expressly permits Stephen and Jerry to continue farming, ranching, and practicing veterinary medicine on the Summit County properties "in the same manner as they have in the past," though only "[t]o the extent that property in the Summit County Trust is held directly or indirectly for ranch, agricultural, or veterinary medicine uses or purposes." The same provision applies to the Trust's properties outside of Summit County. The 2006 Trust also gives June up to five acres of property in Summit County. And it provides for June's children to receive shares of certain properties outside of Summit County following the deaths of Stephen and Jerry.

¶19 In 2008, Dr. Osguthorpe amended his will and trust again (2008 Will and 2008 Trust, or collectively, 2008 Estate Plan). The 2008 Will largely mirrors the 2006 Will, but it made Stephen and Rudd the personal representatives. The 2008 Will also nominated Stephen's siblings as successor personal representatives.[4] The 2008 Trust

---

[2] The 2006 Trust subdivided its properties into two trusts, a "Family Trust" and a "Summit County Trust." The latter contained the real properties in Summit County.

[3] Rudd/Ballard state that a 1993 version of Dr. Osguthorpe's will had contained a $1 million gift to CSUF.

[4] Rudd/Ballard assert that the addition of Rudd as co-personal representative and co-trustee of the 2008 Estate Plan was designed to

(continued . . .)

largely resembles the 2006 Trust, but made Stephen and Rudd successor co-trustees and provided for Rudd to "receive as compensation for acting as a successor trustee an amount equal to five percent (5%) of the fair market value of the trust assets."

*Alleged Improper Conduct of Rudd/Ballard*

¶20 The Osguthorpe Children allege that Rudd/Ballard took a variety of actions that constitute breaches of fiduciary duty, fraud, conversion, unjust enrichment, and undue influence over Dr. Osguthorpe. They allege that these actions were part of Rudd's plan to benefit himself and his family. According to the Osguthorpe Children, this plan began when, sometime in the years following Dr. Osguthorpe's marriage to June, Rudd and Dr. Osguthorpe became acquainted through their family ties. Rudd/Ballard describe the relationship between Rudd and Dr. Osguthorpe as one built on "mutual respect for each other's business acumen" and their "shared farming background." And they say Dr. Osguthorpe was "fully competent to execute" the 2006 and 2008 Estate Plans. The Osguthorpe Children, on the other hand, describe their father's "close relationship" with Rudd as one developed largely while Dr. Osguthorpe's "mental and physical health was failing."

¶21 The Osguthorpe Children allege that the attorney-client relationship that existed between Rudd and June at the time of the prenuptial agreement continued afterwards. They also allege that June enjoyed an attorney-client relationship with Ballard Spahr, the law firm where Rudd was a partner. In 2004 or 2005, Rudd/Ballard also formed an attorney-client relationship with Dr. Osguthorpe "on a variety of matters."

¶22 The Osguthorpe Children allege that Rudd/Ballard were involved in, among other things, the preparation of the 2006 and 2008 Estate Plan amendments. The Osguthorpe Children allege that Rudd/Ballard deceived Dr. Osguthorpe into believing his sons would be able to continue farming, ranching, and practicing veterinary medicine in Summit County because the 2006 and 2008 Trusts expressly stated that Stephen and Jerry would be able to do so "in the same manner as they have in the past." *See supra* ¶ 18. The Osguthorpe Children contend that Rudd/Ballard structured the changes to the Trust in a fashion that undermined the protections for Stephen and Jerry. That is, they assert that the gifts to June and CSUF

address Dr. Osguthorpe's concerns that "Stephen would not carry out his testamentary desires."

would be paid by liquidating the Trust's Summit County properties, leaving insufficient assets to make good on the promises to Stephen and Jerry.[5]

¶23 The Osguthorpe Children allege that the decision to fund the gifts to June and CSUF via sale of the Summit County properties was not Dr. Osguthorpe's. They claim that Rudd and the attorneys who drafted the Estate Plan amendments concocted that plan. And the Osguthorpe Children allege that neither Rudd nor the other attorneys fully explained the potential impacts that these amendments could have on Dr. Osguthorpe's promises to his children regarding their inheritance and the Summit County properties.[6]

¶24 The Osguthorpe Children further allege that the 2006 and 2008 Estate Plan amendments were made at a time when Dr. Osguthorpe had become "increasingly confused about . . . the value of his property" and the various debts that encumbered them. The Osguthorpe Children contend that Rudd "knew" Dr. Osguthorpe's high valuations of his Summit County properties "couldn't be true." Therefore, the Osguthorpe Children imply, Rudd must have understood the practical implications of funding the Trust's gifts to June and CSUF out of the Summit County properties.

---

[5] The Osguthorpe Children explain that, because the gifts to June and CSUF in the 2006 Trust were to be funded by selling Summit County properties and "were to be made before any others," the Osguthorpe Children would not inherit the Trust's Summit County properties "until sufficient property was sold to cover the millions of dollars in debts of [Dr. Osguthorpe's] estate and the $13 million in gifts to June and CSU." The Osguthorpe Children further aver that, given the value of the Summit County property in 2006, "any sales proceeds from the Summit County property would not be enough even to pay the debts and the specific gifts, which would leave no property to continue the farm and ranch." Rudd/Ballard contest this point by arguing that Dr. Osguthorpe "believed the value of his estate was worth at least tens of millions of dollars, more than sufficient to fulfill his bequests to CSUF and June, and to allow his children to continue farming operations on the parcels settled in the Afton Trust."

[6] The Osguthorpe Children also contend the 2006 and 2008 Trust amendments were deceptive by stating that they were "[i]n all respects . . . the same as" the 1998 Trust.

¶25 The Osguthorpe Children allege that Rudd orchestrated the Estate Plan amendments so his aunt June could receive a larger inheritance and so Rudd could receive five percent of the Trust assets as compensation for serving as trustee. The Osguthorpe Children also allege that Rudd improperly received $100,000 from Dr. Osguthorpe in 2008 for acting as his attorney.

¶26 To support their tort claims, the Osguthorpe Children not only reference Rudd's role in the Estate Plan amendments, but also Rudd's participation in multiple other development and loan deals. For example, the Complaint points to Rudd's involvement in negotiating a deal to develop part of the 19 Acres upon which Stephen's house sits, and which Dr. Osguthorpe and Stephen had jointly owned. The Complaint alleges that Rudd directed Stephen to sign documents which transferred title of the 19 Acres to Osguthorpe Properties, LLC, "in which Stephen had no ownership interest." The Complaint further alleges that Stephen directly asked Rudd, before signing, whether the deal would maintain Stephen's ownership of at least the five acres of land upon which his house sits. And, according to the Complaint, Rudd told Stephen that the deal would indeed maintain his ownership because he was an owner of Osguthorpe Properties. In other words, Stephen alleges that Rudd's representations misled Stephen into losing co-ownership of the land under his home.

¶27 The Osguthorpe Children further allege that Rudd behaved improperly after Dr. Osguthorpe's death. They allege that Zions Bank contacted Rudd about a loan that encumbered part of Dr. Osguthorpe's estate, which was at risk of default. According to the Complaint, the Bank asked Rudd to use funds from a checking account named "Osguthorpe Bros. Farms," and Rudd refused to release the funds, asserting that June needed funds from the account "to live on." The Complaint also describes various other loan defaults occurring after Dr. Osguthorpe's death that have "never been cured."

*Alleged Improper Conduct by June and Rudd/Ballard*

¶28 Finally, the Osguthorpe Children contend that June improperly depleted Trust assets by withdrawing $400,000 from a "business checking account" (the Osguthorpe Bros. Farms account) they allege did not belong to her.[7] The Complaint further alleges that

---

[7] We note that the ownership of the bank account is in dispute. The district court rejected Rudd/Ballard's summary judgment

(continued . . .)

Rudd/Ballard did "nothing to obtain the return of these funds." The Complaint also contends that June retained possession of some of Dr. Osguthorpe's personal property and "refused to permit the Osguthorpe children to access much of the personal property for distribution among themselves."

*The Probate Action and Mediations*

¶29 Two months after Dr. Osguthorpe's death, Rudd filed a petition to probate the 2008 Will in the Third District Court (Probate Action). The petition also sought to appoint Rudd and Karen (one of Dr. Osguthorpe's daughters) as co-personal representatives. The petition averred that, although the 1998 Will nominated Stephen as a co-representative, Stephen had not responded to Rudd's attempts to communicate with him and, therefore, Karen should be appointed as co-personal representative instead of Stephen. Rudd also filed a petition to remove Stephen as co-trustee of the 2008 Trust.

¶30 The Osguthorpe Children objected to Rudd's petitions. The Osguthorpe Children also objected to the removal of Stephen as co-trustee, contesting the allegations about Stephen's purported lack of response to Rudd's communications. These filings assert that the 2008 Will and the 2008 Trust were the product of Rudd's undue influence. At the same time, Stephen filed a counter-petition to probate the 1998 Will, declare the 2008 and 2006 Wills and Trusts invalid, and to appoint the Osguthorpe Children as personal representatives.

¶31 The Probate Action court ordered the parties to mediate. The mediation appeared to have been a success when the Osguthorpe Children, June, and Rudd inked a settlement agreement (First Settlement Agreement). However, CSUF had not been notified of the Osguthorpe Children's objection to the 2008 Will and Trust nor the Children's petition to probate the 1998 Will and Trust. And they were not parties to the mediation. As a result, Rudd and CSUF objected to the settlement.

---

motion on the conversion and unjust enrichment claims pertaining to this account because there was a genuine dispute of material fact "related to whether or not the bank account at issue is a joint account with right of survivorship." But the court said, "frankly, I think counsel [for Rudd] is correct in 90 percent of his argument," and the court's "only concern" was that a page was missing from the bank account documents before the court, which created a "material issue" as to ownership of the account.

¶32 The court vacated the First Settlement Agreement. CSUF then moved to intervene in the Probate Action, filed petitions in support of probating the 2008 Estate Plan, and filed objections to the Osguthorpe Children's various counter-petitions and objections. A second attempt at mediation between all of the beneficiaries failed.

*The Tort Action*

¶33 While the probate action was pending, Stephen, individually and also on behalf of the 1998 Trust and Estate, filed an action in the Third District Court against Rudd, Ballard, and June.

¶34 The Complaint alleges that Rudd/Ballard breached their fiduciary duties as attorneys for Dr. Osguthorpe, Stephen, and the Trust. The Complaint also alleges that Rudd breached the fiduciary duties he owed as trustee of the 2008 Estate Plan.[8] The Complaint avers that June aided and abetted these breaches of fiduciary duties, and that she is liable for Rudd/Ballard's actions under an agent-principal theory.

¶35 In addition, the Complaint alleges that Rudd/Ballard and June improperly converted the $400,000 June withdrew from the Osguthorpe Bros. Farm bank account. *See supra* ¶ 28. The Complaint

---

[8] Specifically, the Complaint alleges that Rudd/Ballard breached fiduciary duties because they: (a) had an attorney-client relationship with June that conflicted with the interests of Dr. Osguthorpe, Stephen, and the Trust; (b) "direct[ed] Zions Bank not to use funds in the Osguthorpe Bros. Farms [bank] account" to make loan payments; (c) "fail[ed] to take any action" to recover the $400,000 June removed from the Osguthorpe Bros. Farms bank account; (d) "coordinat[ed] and engineer[ed] the re-drafting" of the 2006 and 2008 Estate Plans in a way that "contravened" the prenuptial agreement between June and Dr. Osguthorpe, personally benefitted Rudd by compensating him as a trustee, and benefitted Rudd/Ballard's other client, June, contrary to the "actual testamentary intent" of Dr. Osguthorpe; (e) attempted to "induce" Dr. Osguthorpe to "violate his own fiduciary duties" owed to the Afton Trust; (f) "misrepresent[ed] to Stephen the contents of the documents . . . which resulted in Stephen losing his ownership interest in the 19 Acres;" (g) "fail[ed] to take actions to protect" the Trust from defaults on various loan agreements; and (h) "receiv[ed] and retain[ed] compensation for legal services rendered in violation of their fiduciary duties, including but not limited to the $100,000 paid" to Rudd.

also brings unjust enrichment claims against Rudd/Ballard and June related to June's $400,000 bank withdrawal and Rudd's receipt of $100,000 from Dr. Osguthorpe. *See supra* ¶ 25.

¶36 Finally, the Complaint alleges Rudd/Ballard and June intentionally interfered with the plaintiffs' "valid expectancy" of inheritance by asserting undue influence over Dr. Osguthorpe, engaging in fraud, and breaching their fiduciary duties. The Complaint contends that this conduct constitutes intentional interference with inheritance (Inheritance Tort Claim).[9]

*Consolidated Tort and Probate Actions*

¶37 The district court consolidated the Probate Action and the Tort Action.

*The District Court Dismisses the Intentional Interference with Inheritance Claim, but Denies Dismissal of Other Claims*

¶38 In 2014, the district court granted Rudd/Ballard's motion to dismiss the tortious interference with inheritance claim on two grounds. First, the court concluded that "no Utah appellate court has expressly stated that Utah recognizes a claim for tortious interference with inheritance. Absent further guidance from the appellate courts, the Court declines to recognize the claim." Second, the court concluded that "even if such a cause of action were recognized by an appellate court in Utah, the Court also considers dismissal appropriate because the issues raised by this cause of action will be resolved in their entire[t]y by the Probate Action."

¶39 The district court denied Rudd/Ballard's motion to dismiss the claims for breach of fiduciary duty, conversion, and unjust enrichment. Further, the court denied in part and granted in part Rudd/Ballard's motion to stay those claims until after resolution of the Probate Action. The court denied Rudd/Ballard's motion to stay the conversion claims and Stephen's *individual* breach of fiduciary duty claim because the court concluded such claims were "separate and distinct from the issues raised in the Probate Action." However, the court granted Rudd/Ballard's motion to stay the claims for

---

[9] The Complaint does not distinguish whether the claim for intentional interference with inheritance belongs to all plaintiffs or to Stephen alone, nor to what extent it belongs to Stephen's siblings, who are listed as "non-parties." For the sake of simplicity, we will refer to this as a claim of the Osguthorpe Children, but we express no opinion on which of them purport to assert the claims.

breach of fiduciary duty owed to Dr. Osguthorpe and the Trust and the claims for unjust enrichment, because the court found that success on those causes of action depended on "whether the amendments to the . . . Trust were validly entered into," which would be resolved in the Probate Action.

*The District Court Removes Stephen and Rudd as Co-Trustees, and Declines to Appoint Stephen's Siblings as Estate Representatives*

¶40  A few months later, the district court removed Stephen and Rudd as co-trustees. The court removed Stephen because it found he had a "number of alleged conflicts of interest"[10] and had committed a "serious breach of trust," and the court was "concerned about other breaches that may occur." The breach of trust included the "wholly undisputed" fact that "Stephen, as trustee, failed to provide CSUF with proper notice" of the Probate Action. The court further reasoned that, "given the number of alleged conflicts of interest, Stephen may not be capable of carrying out his duty of loyalty and acting as a neutral fiduciary." Therefore, the court concluded, "removal best serves the interests of the beneficiaries."

¶41 The court also barred Stephen's siblings from becoming personal representatives for the Estate "because they too have a number of conflicts of interest, including a significant financial interest in seeing that the 2006 and 2008 [Estate Plan] Amendments are declared invalid."

*The District Court Appoints a Special Fiduciary*

¶42 The court then appointed a special fiduciary to manage the affairs of the Trust and Estate. After the first fiduciary resigned, the court appointed a replacement (Special Fiduciary). The court

---

[10] Specifically, the court stated: "Those alleged conflicts include alleging and stating that the 2006 and 2008 Amendments to the Trust are invalid and unenforceable; failing to cooperate with beneficiaries identified in the 2008 Amendment; instituting litigation in both his individual and fiduciary capacities against June as a beneficiary of the 2008 Amendment and against his co-trustee of the 2008 Amendment; and assisting and participating in the Afton Trust transaction. Because of the disputed facts, the Court will not comment on all of these allegations. However, the Court is convinced that, given the number of alleged conflicts of interest, Stephen may not be capable of carrying out his duty of loyalty and acting as a neutral fiduciary."

appointed the replacement Special Fiduciary in the face of Stephen's attempt to persuade the court to have himself reappointed as trustee. In a bid to convince the district court to reappoint him, Stephen had orchestrated offers from third parties to whom the Estate owed money. These third parties would reduce the Estate's debts if and only if the court declined to appoint a special fiduciary and instead put Stephen in charge. The court observed that Stephen's "proposed agreement appears almost to be an attempt at extortion and raises serious concerns." The court then ruled it would not "engage in any bargaining for such an end with [Stephen and the creditors]."

### The District Court Determines that Only the Special Fiduciary May Pursue the Estate's Claims

¶43 In 2016, Rudd/Ballard moved for summary judgment on the claims Stephen asserted on behalf of the Estate. Rudd/Ballard argued that Stephen lacked standing to pursue the claims because he had been removed as trustee and Estate representative. The district court agreed, ruling that under rule 17 of the Utah Rules of Civil Procedure, the Special Fiduciary was the "real party in interest" for the Estate's claims and, therefore, Stephen lacked standing to bring the claims on behalf of the Estate.[11]

¶44 Rather than immediately granting summary judgment on the Estate Claims, the court stated that "if the [Estate] Claims are to be pursued, the Special Fiduciary must be a party to this action and he must be the one to fund and direct the [Estate] Claims." The court directed the Special Fiduciary to "either move to substitute or join the action" by a specific deadline, noting that if the Special Fiduciary did not do so, "the Court will dismiss" the claims.

### The Special Fiduciary Declines to Pursue the Estate Claims

¶45 The Special Fiduciary declined to have the Estate pursue the claims. The Special Fiduciary explained that he "assessed the Claims (and the question of whether he believes those should be pursued)" in light of the duties and standards of care prescribed by statute. He considered the "damages that are being sought through the Claims, and the likelihood of success in prevailing on the Claims or recovering the asserted damages." He noted "significant legal and factual impediments that may impact the viability of the Claims." He

---

[11] The claims at issue included claims for breaches of fiduciary duty allegedly owed to Dr. Osguthorpe and the Trust, conversion, and unjust enrichment. The district court referred to these claims as the "Derivative Claims." We refer to them as the "Estate Claims."

also considered the Estate's "very limited liquid assets." And he ultimately determined that pursuing the claims would not be in the Estate's best interest, as the "cost of pursuing the Claims could ultimately outweigh the likely recovery even if the Estate or the Trust prevail on some or all of the Claims."

*The Osguthorpe Children Propose Assigning the Estate Claims to Themselves, and the Special Fiduciary Defers to the District Court*

¶46 While the Special Fiduciary was considering whether to pursue the Estate Claims, the Osguthorpe Children proposed to him that the Estate assign to Stephen the right to pursue and fund litigation of the Estate Claims. Stephen promised that he would return to the Estate any financial recovery on the claims. The Special Fiduciary responded to the Osguthorpe Children's assignment proposal at the same time he declined to pursue the Estate Claims. The Special Fiduciary stated he was "not necessarily opposed to the Claims being assigned to Stephen" but he was "also cognizant of the conflicts of interest that resulted in Stephen's removal [and] the Court's instructions during the . . . hearing." "As such, the Special Fiduciary would only be inclined to assign the Claims to Stephen with the Court's approval." The Special Fiduciary also clarified that he "was not requesting or proposing or suggesting that [assignment] was an appropriate way to go." He also noted that both "parties feel very strongly in support of their position[s]" and "people are looking for someone to blame." The Special Fiduciary then asked the court to "enter an order approving the Special Fiduciary's foregoing determination"—declining to pursue the Estate Claims.

¶47 That is, the Special Fiduciary asked the court to decide in the first instance whether the Estate Claims should be assigned to Stephen. And, for good measure, the Special Fiduciary asked the court to "enter an order releasing him of any potential liability." The Special Fiduciary referenced Utah Code section 75-3-704, which provides that a personal representative "may invoke the jurisdiction of the court in proceedings authorized by this code to resolve questions concerning the estate or its administration," even on matters which ordinarily would not require court approval. The Special Fiduciary also made clear that that it would be the *court's* decision, not his own, as to whether or not to assign or dismiss the claims.

¶48 The Osguthorpe Children then moved to permit partial assignment of the Estate Claims to Stephen's siblings, not Stephen.[12]

*The District Court Grants Summary Judgment to
Rudd/Ballard on the Estate Claims and Rejects Assignment
of the Estate Claims to the Osguthorpe Children*

¶49 The district court affirmed the Special Fiduciary's determination not to pursue the Estate Claims, finding the Special Fiduciary's decision was "well thought out, well considered, deliberately and intelligently made, and squarely within the Special Fiduciary's powers under the terms of the Court's appointment, the terms of the Trust, and applicable law." As a result, the court entered judgment to "enforce its prior ruling and dismiss the [Estate] Claims with prejudice."

¶50 The court also denied the Osguthorpe Children's motion to assign the Estate Claims to Jerry, Sue Ann, and Karen. The court offered four "equally dispositive reasons" for this denial. The district court concluded that: (A) the requested assignment would "circumvent the Court's prior rulings removing Stephen as Trustee" and barring the other Osguthorpe Children from becoming trustees; (B) assignment of legal malpractice claims and other "claims arising out of the performance of personal services" is impermissible; (C) assignment of a Trust's claims to a beneficiary is impermissible unless the trustee has "improperly refuse[d] or neglect[ed] to bring [the] action"; and (D) the assignment would violate "the Special Fiduciary's duties to the Trust and to the other beneficiaries."

*The District Court Excludes Evidence of
Certain Statements by Rudd*

¶51 In the midst of these motions, hearings, and rulings, Rudd/Ballard moved *in limine* to prevent the Osguthorpe Children from impeaching Rudd with certain statements Rudd had made in an affidavit. Rudd had filed the affidavit in support of a motion to set aside the First Settlement Agreement.

---

[12] This "partial assignment" is the same basic structure as what the Osguthorpe Children had proposed directly to the Special Fiduciary, except the assignees would be Sue Ann, Jerry, and Karen. That is, the would-be assignees wanted to control litigation of the Estate Claims and would provide up-front funding to do so but would seek reimbursement for litigation costs if any recovery was obtained and would give any remaining financial recovery to the Estate.

¶52 The district court granted Rudd/Ballard's motion to exclude the affidavit—even a redacted version—on the grounds that it constituted a "reference to the parties' mediation or the mediation agreement"[13] and "[s]uch evidence is excluded pursuant to rule 401–403 and 408 of the *Utah Rules of Evidence* and Utah Code § 78B-10-104."

¶53 The parties eventually settled their remaining claims, and parts of their settlement were read into the record in January 2017 (Second Settlement Agreement). Under the Second Settlement Agreement, the parties agreed to: probate the 1998 Estate Plan in lieu of the 2006/2008 Plans; remove Rudd/Ballard and June from participating in the probate proceeding moving forward; dismiss the "Osguthorpe Children's claims that the 2006 and 2008 wills and trusts are invalid due to [Dr. Osguthorpe's] lack of testamentary capacity . . . or undue influence by Rudd"; and dismiss the Osguthorpe Children's claims against June from the Tort Action. That Second Settlement Agreement also reserved the Osguthorpe's Children's ability to appeal certain orders.[14]

## ISSUES AND STANDARDS OF REVIEW

*I. Dismissal of the Claim for Intentional Interference with Inheritance*

¶54 The Osguthorpe Children[15] first ask us to review the district court's 2014 dismissal of their tort claim for intentional interference

---

[13] The district court refers to the settlement agreement the parties struck during mediation as the "mediation agreement." We prefer the term "First Settlement Agreement." However, when we quote the district court, we keep the district court's terminology for the sake of readability.

[14] The parties have not included a copy of the settlement agreement in the appellate record. What limited visibility we have into its terms comes from parts that were read into the record before the district court and representations the parties made in their briefs.

[15] The Osguthorpe Children also list the Dr. D.A. Osguthorpe Trust (Trust) as one of the appellants. Rudd/Ballard note that other counsel and a special fiduciary represented the Trust and Estate during the litigation of the claims before us and therefore do not list the Trust or Estate as one of the appellants. We note that the district court determined that Stephen lacked standing to bring the claims of Dr. Osguthorpe's Trust and Estate—a determination which has not

(continued . . .)

with inheritance. "A trial court's decision granting a rule 12(b)(6) motion to dismiss a complaint for lack of a remedy is a question of law that we review for correctness, giving no deference to the trial court's ruling." *Oakwood Vill. LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 9, 104 P.3d 1226. "In reviewing the trial court's decision, we accept the factual allegations in the complaint as true and interpret those facts and all inferences drawn from them in the light most favorable to the plaintiff as the non-moving party." *Id.* "A district court should grant a motion to dismiss only when, assuming the truth of the allegations in the complaint and drawing all reasonable inferences therefrom in the light most favorable to the plaintiff, it is clear that the plaintiff is not entitled to relief." *Brown v. Div. of Water Rights of Dep't of Nat. Res.*, 2010 UT 14, ¶ 10, 228 P.3d 747.

## II. Rejection of the Osguthorpe Children's Proposed Assignment of Estate Claims

¶55 The Osguthorpe Children next ask us to review the district court's denial of their motion to permit partial assignment of the Estate claims to Sue Ann, Jerry, and Karen. Although the court wrapped its denial of the Osguthorpe Children's motion into its summary judgment order disposing of the Estate Claims, we need to look beyond the motion's label and examine what the court did.

¶56 The district court offered four "equally dispositive" reasons for denying the Osguthorpe Children's requested assignment of the Estate Claims. *See supra* ¶ 50. The Osguthorpe Children assert that the entire assignment question is a "mixed question of fact and law that is 'law-like' and subject to de novo review." Rudd/Ballard, on the other hand, assert that different standards of review apply to different aspects of the district court's decision. Rudd/Ballard argue that the question of whether legal malpractice claims are assignable is a "question of law subject to plenary review." Rudd/Ballard assert that the district court's other three grounds are "mixed questions of law and fact subject to a deferential standard of review." We disagree with both parties' descriptions of the standard of review on this issue.

¶57 Ordinarily, a decision to assign a trust's or estate's claims is one within the general discretion of a special fiduciary, pursuant to powers and limitations prescribed in the Trust and Probate Codes, the terms of the will and trust, and the court order appointing the

---

been appealed. We therefore move forward with the understanding that Dr. Osguthorpe's Trust and Estate are not parties to this appeal.

special fiduciary. *See infra* ¶¶ 133–34; *see also Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 30, 308 P.3d 461 ("[A] discretionary decision involves a question with a range of 'acceptable' answers, some better than others, and the agency or trial court is free to choose from among this range without regard to what an appellate court thinks is the 'best' answer."). Here, the Special Fiduciary punted that discretionary decision to the district court. *See supra* ¶¶ 46–47. Therefore, we review the district court's denial of the proposed assignment for an abuse of discretion, and we will overturn that decision only if it fell outside of "the bounds of reasonableness and rationality." *Murray*, 2013 UT 38, ¶ 32. However, "when a legal conclusion is embedded in a district court's discretionary determination, we peel back the abuse of discretion standard and look to make sure that the court applied the correct law." *State v. Boyden*, 2019 UT 11, ¶ 21, 441 P.3d 737. And the question of whether the court properly applied the law to reach its decision presents a question of law we review for correctness. *Rodriguez v. Kroger Co.*, 2018 UT 25, ¶ 11, 422 P.3d 815.

### III. Exclusion of Evidence

¶58 The final issue concerns the Osguthorpe Children's contention that the district court erred when it precluded any use of the affidavit Rudd submitted in support of setting aside the parties' First Settlement Agreement. "Two different standards of review apply to [the Osguthorpe Children's] claims regarding the admissibility of evidence. The first standard of review, correctness, applies to 'the legal questions underlying the admissibility of evidence.' The second standard of review, abuse of discretion, applies to the trial court's decision to admit or exclude evidence . . . ." *State v. Griffin*, 2016 UT 33, ¶ 14, 384 P.3d 186 (citations omitted).

## ANALYSIS

### I. THE DISTRICT COURT ERRED IN DISMISSING THE TORT CLAIM FOR INTENTIONAL INTERFERENCE WITH INHERITANCE

¶59 The Osguthorpe Children argue that the district court erred when it granted Rudd/Ballard's motion to dismiss their claim for tortious interference with inheritance. The district court reasoned that Utah does not recognize such a tort and, even if it did, "dismissal [is] appropriate because the issues raised by this cause of action will be resolved in their entire[t]y by the Probate Action."

¶60 The Osguthorpe Children challenge both parts of the district court's decision. First, the Osguthorpe Children assert that tortious interference with inheritance is a valid common law cause of action in Utah, at least insofar as Utah's probate statutes do not provide a remedy for the same claim. Second, the Osguthorpe Children assert that the Probate Action would not have resolved their specific claims. Rudd/Ballard, on the other hand, urge us to either completely reject this tort or limit recognition to only "circumstances where probate relief is not available." Rudd/Ballard also argue that the Probate Action was the proper avenue for addressing the Osguthorpe Children's claims.

¶61 We largely agree with the Osguthorpe Children on this issue, and we reverse and remand. We recognize the tort of intentional interference with inheritance (Inheritance Tort). But we hold that an Inheritance Tort claim is available only to the extent the Utah Uniform Probate Code (Probate Code), UTAH CODE §§ 75-1-101 to 75-12-118, does not provide a remedy for the specific claims alleged. Thus, we conclude that any portions of the Osguthorpe Children's Inheritance Tort Claim which lack Probate Code remedies should have survived the motion to dismiss. We remand to the district court with instructions to analyze the specific allegations underlying the Osguthorpe Children's Inheritance Tort Claim that may have survived the parties' Second Settlement Agreement and determine which of those issues could have been resolved as part of the Probate Action. To the extent there are live issues that the Probate Action could not have disposed of, the Osguthorpe Children can litigate them.

*A. The Utah Probate Code Does Not Wholly Displace the Inheritance Tort*

¶62 This appeal requires us to examine the interaction between Utah's Probate Code and the common law, because common law causes of action must yield when they have been preempted by a validly enacted statute. *See, e.g.*, *Hill v. Nakai* (*In re Est. of Hannifin*), 2013 UT 46, ¶ 10, 311 P.3d 1016; *Graham v. Albertson's LLC*, 2020 UT 15, ¶ 10, 462 P.3d 367. When we analyze the interaction between a common law cause of action and a statute, ordinarily "we *first* begin by 'determining [whether] there was a valid claim at common law'" and, if there was, we *then* examine whether or to what extent the statute preempts or saves the common law claim. *See Graham*, 2020 UT 15, ¶¶ 10–11 (citations omitted) (emphasis added).

¶63 The situation before us does not neatly follow that framework, however. The common law Inheritance Tort has evolved

over time, in part in reaction to the particulars of a state's probate code. Further, the parties' arguments here largely depend on the reach of Utah's Uniform Probate Code. We therefore begin by analyzing whether and to what extent Utah's Probate Code leaves room for the Inheritance Tort to exist before we turn to whether our common law embraces the Tort.

1.  The Utah Probate Code Expressly Allows Common Law to "Supplement" the Code, Unless "Particular Provisions" of the Code "Displace" the Particular Common Law Principle

¶64 Statutes may implicitly or expressly preempt or save a common law claim. *See Graham*, 2020 UT 15, ¶¶ 10–14, 21–27. Statutes can *implicitly* preempt common law by occupying the field with a regulatory scheme that is "so pervasive" that it leaves no room for common law, or by creating an irreconcilable conflict with common law. *See, e.g.*, *In re Est. of Hannifin*, 2013 UT 46, ¶ 10 (citation omitted); *Graham*, 2020 UT 15, ¶ 14 (citation omitted). Alternatively, statutes can *expressly* preempt or save common law claims. *See Graham*, 2020 UT 15, ¶¶ 10–13, 23–27.

¶65 For example, we have noted that an "exclusive remedy provision" would expressly preempt common law remedies. *Id.* ¶ 13 & n.5 (citing *e.g.*, UTAH CODE § 34A-5-107(15) ("The procedures contained in this section are the exclusive remedy under state law for employment discrimination . . . .")). By contrast, a savings clause can expressly preserve common law remedies or other statutory remedies. *See id.* ¶¶ 21–23 (holding Utah's OSHA statute saved common law remedies, where it provided: "Nothing in this chapter is deemed to limit or repeal requirements . . . otherwise recognized by law," nor shall it "in any manner . . . enlarge or diminish or affect the common-law . . . rights, duties, or liabilities of employers and employees . . . .").

¶66 Utah's Probate Code does not contain an "exclusive remedy" provision.[16] *See* UTAH CODE §§ 75-1-101 to 75-12-118.[17] But it

---

[16] Rudd/Ballard imply that two subject matter jurisdiction provisions in the Trust and Probate Codes operate as exclusive remedy provisions to preempt the Osguthorpe Children's Inheritance Tort Claim. We disagree. The Trust Code's grant of "exclusive jurisdiction" to "[t]he court" over "proceedings initiated by interested parties concerning the internal affairs of trusts," *see* UTAH CODE § 75-7-201(1), is not the same thing as an "exclusive remedy" provision. *Cf. id.* § 34A-5-107(15). Further, the "court" refers

(continued . . .)

does contain a savings clause. *See In re Est. of Hannifin*, 2013 UT 46, ¶ 12 (examining UTAH CODE § 75-1-103). Specifically, Utah's Probate Code expressly saves "principles of law and equity," but only to the extent they are not "displaced by the particular provisions of this code." *See* UTAH CODE § 75-1-103. Utah's Trust Code similarly provides: "The common law of trusts and principles of equity supplement this chapter, except to the extent modified by this chapter or laws of this state." *Id.* § 75-7-106. In other words, the default is that common law "supplements" the Code and, therefore, the question we must examine is whether any particular provisions of the Code would "displace" or "modify" the Inheritance Tort.

¶67 In *In re Estate of Hannifin*, we interpreted the general savings and specific displacement clause of Utah Code section 75-1-103 as requiring a "conflict preemption" analysis. *See* 2013 UT 46, ¶ 12.

---

to "any of the courts of record in this state having jurisdiction in matters relating to the affairs of decedents." *Id.* § 75-1-201(8). And "courts of record" include Utah's supreme court, court of appeals, district courts, and juvenile courts, but not the justice courts. *See id.* § 78A-1-101.

Nor does the Probate Code create an "exclusive remedy" when it provides that "[t]he court may hear and determine formal proceedings involving administration and distribution of decedents' estates," which "shall include proceedings to determine the heirs of a decedent and proceedings to construe a duly probated will of a decedent." *See id.* § 75-3-105. In fact, this is expressly a "[j]urisdiction of subject matter" provision. *Id.* Nor are other subject matter jurisdiction provisions of the Trust and Probate Codes "exclusive remedy provisions." *See id.* § 75-7-203; *id.* § 75-1-302(1). Such provisions granting subject matter jurisdiction or original jurisdiction over certain subjects to certain state courts, to the exclusion of other state or federal courts, do not generally operate to have a statute preempt common law. However, our conclusion that these provisions do not preempt all common law claims pertaining to wills and trusts does not preclude a conclusion that other provisions of the Probate and Trust Codes may preempt or displace certain common law claims.

[17] The Utah Uniform Probate Code is all of Title 75 of the Utah Code. The Utah Uniform Trust Code is Chapter 7 of Title 75. We refer to the Probate Code when discussing any provision in Title 75. We refer to the Trust Code when referring to a provision in Chapter 7.

Specifically, we held that the Probate Code displaced a common law claim that would have operated outside of "clear and detailed" provisions of the Code that "leave no room for common-law adaptation" on the type of issues raised in that claim, *see id.* ¶ 12 n.2, and where allowing that common law claim would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives" of the Code. *Id.* ¶ 32 (citation omitted). But at the same time, we recognized in *In re Estate of Hannifin* that there may be other "provision[s] of the Probate Code [which are] amenable to supplementation" by other common law claims. *Id.* ¶ 12 n.2.

2. The Probate and Trust Codes Displace Some Forms of the Inheritance Tort, Including Those Seeking to Interpret or Invalidate Wills or Interfere with Efficient Distribution of Estate Assets

¶68 The Probate Code aims to strike a balance between honoring "the intent of a decedent in distribution of his property" and the sometimes competing goals of "promot[ing] a speedy and efficient" estate administration and distribution system, "simplify[ing] and clarify[ing] the law concerning the affairs of decedents," and "mak[ing] uniform the law among the various jurisdictions." *See* UTAH CODE § 75-1-102. The Probate Code gives effect to its many goals in several ways, delineating a web of standards and procedures for executing, amending, recognizing, and challenging wills and trusts.

¶69 We agree with Rudd/Ballard that Utah's Probate and Trust Codes embrace the notion of the "testator's freedom of disposition." Any "individual 18 or more years of age who is of sound mind may make a will" or create a trust. *See id.* § 75-2-501 (wills); *id.* § 75-7-402(1)(a) (trusts); *id.* § 75-7-604 (revocable trusts). Further, as this court has observed, "a testator has complete control to amend, modify, or revoke his will during his lifetime." *Patterson v. Patterson*, 2011 UT 68, ¶ 35, 266 P.3d 828. In addition, Utah Code sections 75-7-605(3) and 75-7-606(1) give wide latitude for a settlor to voluntarily revoke, modify, and control a revocable trust. But these particular provisions and concepts do not speak directly to the issues the Inheritance Tort aims to address: improper interference with the testator's or settlor's intent.

¶70 The Probate Code provides that "[p]ersons interested in decedents' estates . . . may petition the court for orders in formal proceedings within the court's jurisdiction, including, but not

limited to those described in this chapter." UTAH CODE § 75-3-105(1);[18] *see also id.* § 75-3-402(1) ("Petitions for formal probate of a will . . . shall be directed to the court, request a judicial order after notice and hearing, and contain further statements as indicated in this section."); *id.* §§ 75-3-401–406 (describing additional requirements for formal testacy proceedings).

¶71 The Probate Code also describes the burdens parties will face in a probate proceeding construing a will. "Proponents of a will have the burden of establishing prima facie proof of due execution" of the will.[19] *Id.* § 75-3-407(1). "Contestants of a will have the burden of establishing lack of testamentary intent or capacity, undue influence, fraud, duress, mistake, or revocation." *Id.* Likewise, the Trust Code provides that "[a] trust is void to the extent its creation was induced by fraud, duress, or undue influence." *Id.* § 75-7-406.[20] These provisions—allowing a will or trust to be overturned but placing the burden on those seeking the invalidation—effectuate a balancing of the Probate Code's competing goals of expediency and honoring a testator's intent.

¶72 That balancing is also reflected in the duties of estate "personal representative[s]," who must "settle and distribute the estate" both "in accordance with the terms of any probated and effective will" and also "as expeditiously and efficiently as is

---

[18] "[F]ormal proceedings involving administration and distribution of decedent[]s['] estates shall include proceedings to determine the heirs of a decedent and proceedings to construe a duly probated will of a decedent, whether or not the estate of the decedent is being, or previously has been, administered or distributed." UTAH CODE § 75-3-105(2).

[19] However, we also note that "[a] testator is presumed competent to make a will." *In re Est. of Kesler*, 702 P.2d 86, 88 (Utah 1985) (citation omitted).

[20] Notably, Utah Code sections 75-3-407 and 75-7-406 enumerate closed lists of specific causes of action which, if proven, void a will or trust; they leave no room for other causes of action in this context. Therefore, where someone seeks to challenge the validity of a will or trust based on a theory that it does not reflect the testator's true intent, that person must do so in a manner consistent with the framework of the Probate Code—by proving one of the following: fraud, duress, undue influence, or (if a will) mistake, revocation, or lack of testamentary intent or capacity.

consistent with the best interests of the estate." *See id.* § 75-3-703(1). Likewise, a trustee must "administer the trust expeditiously and in good faith, in accordance with its terms and purposes and the interests of the beneficiaries." *Id.* § 75-7-801; *see also id.* § 75-7-201(2)(b) ("The management and distribution of a trust estate . . . shall proceed expeditiously consistent with the terms of the trust.").

¶73 The Probate Code also reflects its goal of expediency in tight deadlines for various aspects of estate administration and claims by and against estates. *See, e.g., id.* §§ 75-3-107, 75-3-108, 75-3-802, 75-3-803, 75-3-1005, 75-3-1006, 75-7-509, 75-7-607. The Probate Code further reflects the goal of efficiency in provisions that give finality to certain court decisions pertaining to estate administration and distribution. Utah Code section 75-3-105 provides that if a person is notified of "formal proceedings involving administration and distribution of decedents' estates," including "proceedings to determine the heirs of a decedent and proceedings to construe a duly probated will of a decedent," such "[p]ersons notified are bound though less than all interested persons may have been given notice." Similarly, Utah Code section 75-3-412(1) provides that, subject to appeal and certain statutory exceptions, "a formal testacy order . . . is final as to all persons with respect to all issues concerning the decedent's estate that the court considered or might have considered incident to its rendition relevant to the question of whether the decedent left a valid will, and to the determination of heirs . . . ."

¶74 Reading these provisions together, we begin to see where the Probate Code displaces some forms of the Inheritance Tort. No person can circumvent the statutory deadlines and limitations by bringing an untimely claim in tort that seeks to address the same issues or achieve the same ends as those covered in the Probate or Trust Code. *See* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 19 cmt. c (AM. L. INST. 2020). An Inheritance Tort claim also may not seek to collaterally attack or effectively overturn a court's prior decision in a formal proceeding interpreting or administering a will, trust, or estate, if the person bringing the Tort had notice of such proceeding. *See* UTAH CODE § 75-3-105. Nor may any person bring an Inheritance Tort claim that seeks to litigate or relitigate issues pertaining to a will's validity or determination of heirs which were "considered or might have [been] considered" in a formal testacy order. *See id.* § 75-3-412(1).

3. The Probate Code Leaves Room for Some Forms of the Inheritance Tort

¶75 Contrary to Rudd/Ballard's assertions, not all forms of the Inheritance Tort "run[] counter to existing Utah law" or collaterally attack probate proceedings.[21] On this point, we agree with the Oregon Supreme Court:

> [I]t is true that [the Probate Code] strictly controls the kinds of issues that can be litigated in a proceeding to probate a will, and presumably requires plaintiffs to pursue those issues in the probate system where possible, [but] that fact does not necessarily translate into a broader legislative purpose to deny legal significance to any other issue that might arise out of a decedent's making of, or failure to make, a will. Whether or not the probate code is or may be a "complete" legislative scheme, it is complete only within the confines of its subject matter, i.e., will

---

[21] Rudd/Ballard cite *DeWitt v. Duce*, 408 So. 2d 216, 218 (Fla. 1981), which Rudd/Ballard assert "survey[ed] cases to conclude that tortious interference actions are 'impermissible collateral attacks [sic] on the probate proceedings.'" *DeWitt* did not conclude the Inheritance Tort is always an impermissible collateral attack on probate proceedings, though it did survey other jurisdictions who came to that conclusion. Rather, *DeWitt* held that the particular claims brought by the plaintiff-appellants in that case—contesting the validity of a will and seeking conveyance of the testator's house—could not proceed in tort because they "had an adequate remedy in the probate proceedings," yet they had willingly failed to exhaust that option. *DeWitt*, 408 So. 2d at 220. "The rule is that if adequate relief is available in a probate proceeding, then that remedy must be exhausted before a tortious interference claim may be pursued." *Id.* at 218. At the same time, the court acknowledged that "a cause of action for wrongful interference with a testamentary expectancy has been recognized in this state." *Id.* And the court delineated examples of when the tort might be available and appropriate, including where a defendant's tortious conduct "caused the testator to make an inter vivos conveyance to [the] defendant of assets that would otherwise have been part of the estate," *id.* at 219, or caused the testator to "omit a gift to the aggrieved party," where no prior will including that intended gift existed. *Id.* at 219 n.7 (citations omitted).

contests. A tort claim does not become a will contest simply because it arises out of facts relating to the making or unmaking of a will.

*Allen v. Hall*, 974 P.2d 199, 204 (Or. 1999) (en banc).

¶76 The Third Restatement of Torts and other courts outline a number of circumstances where a plaintiff may lack a remedy in a probate proceeding. For example, a probate proceeding might not remedy a claim that "the decedent intended to create a different will" which would have added a gift to the plaintiff, yet the decedent "was prevented from doing so by the defendant." RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 19 cmt. c. The Oregon case of *Allen v. Hall* illustrates this. There, the plaintiffs alleged that a testator intended to create a new will which would have gifted a house to them, but the defendants prevented the testator from finalizing the new will by involuntarily hospitalizing the testator, telling the testator's attorney he could not execute the new will, and falsely claiming power of attorney over the testator to prevent the hospital from giving life support. *Allen*, 974 P.2d at 204–06. The Oregon Supreme Court held the plaintiffs had a valid tort claim for damages. *Id.* at 201.

¶77 The Florida Supreme Court has similarly recognized that, in such situations, an "action at law for damages against the defrauder" may be appropriate. *See DeWitt v. Duce*, 408 So. 2d 216, 219 n.7 (Fla. 1981) (citation omitted). As the Florida court explained, "[p]robate can strike from the will something that is in it as a result of fraud but cannot add to the will a provision that is not there nor can the probate court bring into being a will which the testator was prevented from making and executing by fraud." *Id.* (citation omitted).

¶78 The Third Restatement and other courts also recognize that claims related to gifts a plaintiff expects to receive outside of a will, such as a life insurance policy, may not be addressed in a probate proceeding construing a will, and an Inheritance Tort claim may be available. *See* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 19 cmt. e; *see also id.* § 19 illus. 6. Similarly, a plaintiff might not find relief in probate court to remedy "wrongful conduct in relation to a nonprobate transfer, such as a transfer by inter vivos trust." *Id.* § 19 cmt. c. If a "defendant's tortious conduct had caused the testator to make an inter vivos conveyance . . . of assets that would otherwise have been part of the estate, setting aside the will [through a probate proceeding] would be inappropriate redress[,] and consequently a tort action is properly allowed." *DeWitt*, 408 So. 2d at 219 (citing

*Hegarty v. Hegarty*, 52 F.Supp. 296 (D. Mass. 1943); *Cyr v. Cote*, 396 A.2d 1013 (Me. 1979)); *see also Harmon v. Harmon*, 404 A.2d 1020, 1021 (Me. 1979) (holding that the Inheritance Tort was available to a plaintiff who alleged that the defendant induced the testator by fraud and undue influence to transfer valuable assets to the defendant while he was alive, which "effectively disinherited the Plaintiff").[22]

¶79   There are likely other claims that fall into the Inheritance Tort which also would not be remedied in probate. Our examples here are not intended to be a definitive list. But they demonstrate that Utah's Probate Code leaves room for the Inheritance Tort.

¶80 In sum, we conclude that the Probate Code has a preemptive effect on some claims that seek to invalidate a will, interfere with distribution of estate assets, or relitigate issues or remedies which were or could have been considered in a formal probate proceeding. *See supra* ¶ 74. But we also conclude there are claims that seek to remedy other types of harms and thus are not displaced by the Probate and Trust Code.

*B. The Tort of Intentional Interference with Inheritance Is a Valid Common Law Claim, Subject to the Probate Code's Limitations*

¶81 The district court dismissed the Osguthorpe Children's Inheritance Tort Claim in part because the court concluded that Utah did not recognize the tort of intentional interference with inheritance.

¶82   The Osguthorpe Children urge us to explicitly recognize the Inheritance Tort for several reasons. First, the Osguthorpe Children note that the Inheritance Tort is related to the tort of intentional interference with prospective economic relations, which has long been a part of Utah law. Second, the Osguthorpe Children highlight that the Second and Third Restatements of Torts recognize the Inheritance Tort. Third, other jurisdictions have adopted the Inheritance Tort using persuasive reasoning.

---

[22] However, we also acknowledge, as the Restatements do, that such a claim alleging wrongful depletion of assets might belong with the executor of the estate, but an Inheritance Tort claim by the beneficiary would "remain[] available if a probate court, for whatever reason, lacks the power to provide redress." RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 19 cmt. c (AM. L. INST. 2020).

1. Utah Has Long-Recognized Torts for Interference with Economic Relations

¶83 The Osguthorpe Children note that Utah has, for nearly four decades, expressly recognized a tort similar to the Inheritance Tort—the tort of intentional interference with prospective economic relations. *See Leigh Furniture & Carpet Co. v. Isom,* 657 P.2d 293, 302–04 (Utah 1982), *overruled in part by Eldridge v. Johndrow*, 2015 UT 21, ¶ 70, 345 P.3d 553 (requiring improper means, not merely improper purpose, to serve as the basis of liability for tortious interference with prospective economic relations, but otherwise leaving Utah's recognition of the tort intact). Further, Utah has recognized additional similar torts for even longer. In *Leigh Furniture*, we adopted the tort of intentional interference with prospective economic relations, in part because of its close relationship to the tort of interference with contractual relations, which Utah had recognized since the early 1960s. *See* 657 P.2d at 303.

¶84 In *Leigh Furniture*, we noted that there are multiple variations of similar torts falling into the "total class[] of protections against wrongful interference with advantageous economic relations." *Id.* at 301 (citations omitted). And we acknowledged the lengthy history of the tort of intentional interference with prospective economic relations, as reflected in the "plethora" of case law from other jurisdictions, the "abundant literature," and the Restatements. *See id.* at 302.[23]

¶85 The centuries-long history of courts on both sides of the pond recognizing various forms of torts for intentional interference with economic expectations—alongside Utah's express recognition of those torts since the early 1960s—is notable for our analysis because such torts fall into the same category as the Inheritance Tort. *See* RESTATEMENT (SECOND) OF TORTS § 774B cmt. a (AM. L. INST.

---

[23] In fact, the Second Restatement dates express recognition of the tort of interference with prospective contracts or business expectations to as "early as 1621 [in] the court of King's Bench." RESTATEMENT (SECOND) OF TORTS § 766B cmt. b (AM. L. INST. 1979); *see also* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 18 cmt. a (listing varying names of that tort). The Second Restatement further explains that "[p]recedent for these decisions is found as early as the fifteenth century, and even earlier," citing cases as far back as 1356. RESTATEMENT (SECOND) OF TORTS § 766B cmt. b.

1979); RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 19 cmt. a (AM. L. INST. 2020).

¶86 Other courts have used this logic to recognize the Inheritance Tort. *See Harmon v. Harmon*, 404 A.2d 1020, 1023 (Me. 1979) ("If the law protects a person from interference with an opportunity to receive a benefit by entering into contractual relations in the future, the same protection should be accorded to a person's opportunity to receive a benefit as a prospective legatee."); *see also Ross v. Wright*, 190 N.E. 514, 517 (Mass. 1934) ("The view of the law most favorable to the plaintiff would be that her alleged expectancy of receiving property by gift . . . is entitled to as complete protection against intentional interference as rights under existing contracts or the 'right to carry on business, that is, to make contracts without interference.'"), *cited by Labonte v. Giordano*, 687 N.E.2d 1253, 1255 (Mass. 1997) (proclaiming that Massachusetts had "long recognized a cause of action for tortious interference with the expectancy of receiving a gift").

¶87 In addition, at least one other court, the Oregon Supreme Court, found the tort of intentional interference with prospective economic relations to be so related to the Inheritance Tort that the court deemed it unnecessary to recognize the latter as a standalone vehicle to provide relief to plaintiffs who sought to recover the value of their expected inheritance that had been lost as a result of the defendants' tortious conduct. *See Allen*, 974 P.2d at 202. The Oregon court held it could provide relief under the already "well-established" tort of "intentional interference with economic relations." *Id.* The court explained that although it had previously "applied that tort only to contractual and business relationships and prospects, we are persuaded that the tort also may, by a reasonable and principled extension, be made applicable to some *noncommercial* relationships and prospects, such as the one alleged by plaintiffs in the present case." *Id.* We find the parallels the Oregon court draws to be instructive, though we ultimately find utility in recognizing intentional interference with inheritance as a standalone tort with its own elements, in order to expressly confront what the Restatements call potential "complications" with probate. *See* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 19 cmt. a.

¶88 In sum, we agree with the Osguthorpe Children that our prior recognition of the tort of intentional interference with prospective economic relations supports a decision to adopt the

Inheritance Tort. It should not be considered a great change or surprise for Utah to expressly recognize the Inheritance Tort, when it is a variant of other torts we have long embraced.[24]

2. The Second and Third Restatements Recognize the Inheritance Tort

¶89 The Osguthorpe Children next highlight that both the Second and Third Restatements of Torts recognize the Inheritance Tort. We have, at times, consulted the Restatements when deciding whether Utah should adopt a cause of action. *See, e.g.*, *Leigh Furniture*, 657 P.2d at 302–04 (examining the definition used in the Second Restatement for the tort of interference with prospective economic relations, though ultimately adopting Oregon's definition).

¶90  Here too, we find the Restatements instructive. The general rationale behind the Inheritance Tort is, as the Third Restatement comments explain, to address situations where a defendant intentionally wronged a third party (e.g., the testator), yet the person most injured is the plaintiff (who has now lost their economic or inheritance expectancy). *See* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 19 cmt. a. Absent the Inheritance Tort, the plaintiff there would ordinarily not have been able to recover against the defendant because the third party was the direct victim of the wrong. The Inheritance Tort provides an avenue for relief in some of these situations. *See id.*

¶91 The Second Restatement expressly recognized the Inheritance Tort in 1979, *see* RESTATEMENT (SECOND) OF TORTS § 774B, though the origins of the Tort are much older.[25] Since then, as

---

[24] The Osguthorpe Children also contend that Utah has "implicitly recognized" the Inheritance Tort, in *McBroom v. Child*, 2016 UT 38, 392 P.3d 835, and in *Biesele v. Mattena*, 2019 UT 30, 449 P.3d 1. The persuasive value of those cases is limited, however, because in neither were we asked to opine on whether Utah recognized the Inheritance Tort.

[25] As discussed above, the Inheritance Tort evolved out of torts proscribing intentional interference with various forms of economic expectancies—torts which date back several centuries. *See supra* ¶¶83–85. Estimates vary as to precisely when these torts began to be recognized and applied in the context of an expected inheritance or gift, but it is safe to say the Inheritance Tort in the United States traces back to at least the 1930s, if not the early 1900s. *See* John C.P.

(continued . . .)

probate laws have evolved and as courts have weighed more specific applications of the Inheritance Tort, the Restatements have recognized that evolution. Notably, the recently adopted Third Restatement continues to recognize the Inheritance Tort, but in a form that now expressly accounts for the potential tension with probate statutes. It provides that an Inheritance Tort claim "is not available to a plaintiff who had the right to seek a remedy for the same claim in a probate court." RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 19(2).

3. Other Jurisdictions' Rationales Persuade Us of the Validity of the Inheritance Tort under Certain Conditions

¶92  Both sides here assert that the "majority" of courts of other jurisdictions have adopted their respective positions. Cases and secondary sources the parties cite reflect the abundance of law and scholarship on the issue, with varying takes across the country. We note that our colleagues on the South Dakota Supreme Court recently published an excellent survey of decisions on the Inheritance Tort from the highest state courts across the country, and we see little value in including a full-scale repetition of their effort in this already stuffed opinion. *See In re Certification of Question of Law from the U.S. Dist. Ct.* (*Briggs v. Briggs*), 931 N.W.2d 510, 513 (S.D. 2019). As the South Dakota Supreme Court noted, it appears that roughly equal numbers of states' highest courts have rejected and recognized the Inheritance Tort—with a narrow lead for the Tort's recognition, albeit with limitations requiring the unavailability or exhaustion of probate remedies. *See id.* at 513–16 (citing *inter alia DeWitt*, 408 So. 2d at 218; and *Bjork v. O'Meara*, 986 N.E.2d 626, 633 (Ill. 2013)).

¶93  For example, Maine has adopted the Inheritance Tort largely because it had already adopted the similar tort of prospective contractual relations. *See Harmon*, 404 A.2d. at 1023 ("If the law

---

Goldberg & Robert H. Sitkoff, *Torts and Estates: Remedying Wrongful Interference with Inheritance*, 65 STAN. L. REV. 335, 366 (2013) (explaining that *Bohannon v. Wachovia Bank & Trust Co.*, 188 S.E. 390 (N.C. 1936), is "perhaps the first case formally to recognize the interference-with-inheritance tort"); *see also Labonte v. Giordano*, 687 N.E.2d 1253, 1255 (Mass. 1997) (proclaiming that Massachusetts had "long recognized a cause of action for tortious interference with the expectancy of receiving a gift in certain limited conditions," citing cases from 1907, 1934, and 1943).

protects a person from interference with an opportunity to receive a benefit by entering into contractual relations in the future, the same protection should be accorded to a person's opportunity to receive a benefit as a prospective legatee."); *see also Allen*, 974 P.2d at 202 (holding that the tort of intentional interference with prospective economic relations may be "applicable to some *noncommercial* relationships," including the plaintiff's claim for tortious interference with their expectancy in inheriting a house). As we noted above, we find this logic persuasive, given that Utah has long recognized multiple types of tortious interference with economic relations. *See supra* ¶¶ 83–88.

¶94 We are also persuaded by courts that have undertaken an examination of the interaction between their state's probate code and the types of claims that may fall under the Inheritance Tort, and have concluded that, although probate may provide remedies and displace the Tort in some situations, the Tort should be available for situations that probate cannot address.

¶95 For example, the Illinois Supreme Court reaffirmed the Inheritance Tort as a "widely recognized cause of action" and also declared that the Tort is unavailable where plaintiffs have "an opportunity to contest a probated will but choose not to do so," or where the tort remedy "would have the practical effect of invalidating a will that had been validated through the Probate Act" or would give the plaintiffs "a second bite of the apple." *Bjork*, 986 N.E.2d at 631–33 (citing *inter alia Robinson v. First State Bank of Monticello*, 454 N.E.2d 288 (1983); *In re Est. of Ellis*, 923 N.E.2d 237 (Ill. 2009); and RESTATEMENT (SECOND) OF TORTS § 774B). Similarly, the Florida Supreme Court in *DeWitt v. Duce* reaffirmed Florida's recognition of the "cause of action for wrongful interference with a testamentary expectancy," but also held that "if adequate relief is available in a probate proceeding, then that remedy must be exhausted before a tortious interference claim may be pursued." 408 So. 2d at 218. The court reasoned that an Inheritance Tort claim would be considered an "impermissible collateral attack" on a probate action when the plaintiff seeks to set aside a will but willingly fails to bring or participate in a probate action. *Id.* at 218–21.[26]

---

[26] Specifically, in *DeWitt,* the plaintiffs alleged the defendant exercised undue influence which caused the testator to make changes to his will that reduced the plaintiffs' expected inheritance.

(continued . . .)

¶96    The Iowa Supreme Court dealt with similar concerns in *Youngblut v. Youngblut*, 945 N.W.2d 25 (Iowa 2020). The plaintiff-appellants in *Youngblut* brought an Inheritance Tort claim that "challenged [a] will and nothing but the will," based on allegations that the defendant used wrongful means, including fraud, duress, and defamation to induce the decedents into amending their wills. *Id.* at 38–39. Further, the plaintiffs "deliberately bypassed challenging the will in probate proceedings" and even "accepted that will in the probate proceedings." *Id.* at 39. The Iowa Supreme Court barred the plaintiff-appellants' claim and held that "a party alleging a decedent's will was procured in whole or in part by tortious interference must join such claim together with a timely will contest." *Id.* at 37. The court reasoned that its holding would "honor the legislature's goal of prompt and effective estate administration," adhere to the probate code's higher burden of proof requirements for determining the validity of a will, and respect the statutory requirement "that the distribution coming out of probate should be a final and conclusive distribution unless a specific exception . . . applies." *Id.*

¶97    But the court carefully emphasized that its requirement that a claim be brought as part of the probate proceeding would apply solely to claims seeking to be a "de facto *substitute* for a will

---

408 So. 2d at 217. The plaintiffs had the opportunity to contest the allegedly invalid will in probate proceeding and offer the earlier will they claimed was valid. *Id.* In fact, they initially did so, but then "voluntarily dismissed the petition . . . choosing to take under the [amended] will." *Id.* The plaintiffs later made those same allegations in the tort action and "sought conveyance of [the decedent's] residence and an accounting for residuary amounts, both of which they would have received under the earlier will. They also sought punitive damages." *Id.* at 217–18. The court held that because the plaintiffs "had an adequate remedy in the probate proceedings," yet they had willingly failed to exhaust that option, they were barred from bringing their tort action. *Id.* at 220. The court also noted that the probate remedy was adequate because, "[f]or purposes of adequacy of relief we do not consider punitive damages as a valid expectation. Adequacy is predicated on what the probate court can give as compared to what the plaintiff reasonably expected from the testator prior to interference." *Id.* at 220 n.11. We agree with the Florida Supreme Court that this is an example of a situation in which the Probate Code would displace the Inheritance Tort.

contest"—i.e., "claims that a party tortiously interfered with an inheritance by inducing the decedent to execute a will through wrongful means"—and not to claims seeking to address other wrongs. *Id.* at 35, 37. The Iowa court explained: "[W]e are not persuaded by those courts and commentators who see *no* role for the tort of intentional interference with an inheritance. *The tort has value in circumstances when a probate proceeding cannot provide an adequate remedy.*" *Id.* at 35 (second emphasis added). The court added: "Generally speaking, we agree with the authors of the Third Restatement that where no claim is available in probate court for the conduct in question, then the claim cannot be precluded by failure to bring the claim in probate court." *Id.* at 37 n.3 (citing RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 19 cmt. c).

¶98 Rudd/Ballard argue that many courts have reached the contrary result. Both South Dakota and Texas, for example, appear to reject the Inheritance Tort in all its forms. In *Briggs v. Briggs*, the South Dakota Supreme Court refused to recognize the Tort because it found that South Dakota's trust and probate statutes provided adequate remedies not only for the plaintiff's claim challenging a will and trust, but also for other hypothetical situations. *See* 931 N.W.2d at 518. In *Archer v. Anderson*, the Texas Supreme Court rejected the Inheritance Tort after reasoning that "existing law affords adequate remedies for the wrongs the tort would redress, and . . . the tort would conflict with Texas probate law." 556 S.W.3d 228, 229 (Tex. 2018).

¶99 We agree with the response of the four justices in *Archer* who concurred in the judgment but dissented from the majority's rejection of the Inheritance Tort: "[We] disagree that the Court can realistically predict that the law in its current state affords adequate remedies for all situations that might arise in the future where bad actors wrongfully relieve elderly persons of assets intended for others." *Id.* at 240 (Johnson, J., concurring). Further, we "do not dispute that probate law will be applicable and provide an adequate remedy in many situations. Nevertheless, under certain circumstances probate proceedings may not be a viable option for relief to a would-be beneficiary." *Id.* at 244. Making the Inheritance Tort available in those situations "would not conflict with probate law but would augment it when properly cabined in." *Id.* at 240. Finally, "[e]ven if [another tort] remedy other than tortious interference with expectancy of inheritance was viable in such a situation, then having the tortious interference remedy as a backup would do no harm." *Id.* at 243. In short, there may be wrongs that probate cannot remedy, and we think it unwise to foreclose the

ability of Utah plaintiffs to avail themselves of the Inheritance Tort as a means to address what probate cannot.

¶100 In sum, based on our review of the Inheritance Tort's lengthy history, Utah's long-time recognition of similar torts, the Restatements, other jurisdictions' rationales, and Utah's Probate Code, we conclude there is a valid claim at common law for the tort of intentional interference with inheritance and that our Probate Code leaves room for supplementation by some forms of the Tort, while displacing others. Therefore, the district court erred in dismissing the Osguthorpe Children's Inheritance Tort Claim when it reasoned that Utah does not recognize this cause of action at all.

¶101 We hold that Utah recognizes a claim at common law for intentional interference with inheritance, consistent with the elements the Third Restatement of Torts describes:

> (1) A defendant is subject to liability for interference
> with an inheritance or gift if:
>   (a) the plaintiff had a reasonable expectation of
>       receiving an inheritance or gift;
>   (b) the defendant committed an intentional and
>       independent legal wrong;
>   (c) the defendant's purpose was to interfere with
>       the plaintiff's expectancy;
>   (d) the defendant's conduct caused the expectancy
>       to fail; and
>   (e) the plaintiff suffered economic loss as a result.

RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 19.

¶102 But we also hold that the Inheritance Tort "is not available to a plaintiff who had the right to seek a remedy for the same claim" under Utah's Probate Code. *Id.* § 19(2). Utah's Probate Code displaces applications of the Inheritance Tort that seek to: invalidate a will; interfere with distribution of estate assets; relitigate issues or remedies which were or could have been considered in a formal probate proceeding; otherwise circumvent the Code's express limitations, procedures, limited causes of action for challenging wills; or conflict with any other relevant provision of the Probate Code. *See supra* ¶¶ 74, 80. Whether a particular Inheritance Tort claim conflicts with the Code is a case-by-case determination that depends on the nature of the claim, the allegedly wrongful conduct, the nature of the inheritance or gift, and—putting those together—whether the Probate Code could provide a remedy for the same claim. We stress however, that the inquiry turns on the availability, and not the adequacy, of the remedy the Probate Code offers. *See*

RESTATEMENT (THIRD) TORTS: LIAB. FOR ECON. HARM § 19, Reporter's Note cmt. c ("[C]laims in tort are foreclosed by the availability of probate, not by the 'adequacy' of probate."); *see also id.* § 19 cmt. c ("A proceeding in probate is considered available, for purposes of this Section, even if it offers less generous relief than would be attainable in tort.").

*C. The District Court Erred in Dismissing the Inheritance Tort Claim on the Grounds that "the issues raised by this cause of action will be resolved in their entire[t]y by the Probate Action"*

¶103 The district court concluded that even if Utah recognized the Inheritance Tort, the Osguthorpe Children could not assert it because the Probate Action would resolve all "the issues raised by this cause of action." The district court's succinct decision offers little insight into its reasoning, and our own analysis causes us to not share the district court's confidence.

¶104 Rudd/Ballard contend that the Osguthorpe Children's Inheritance Tort Claim "is premised on the same allegations in the Probate Action that the 2006 and 2008 Trust Documents were the product of undue influence exercised by Rudd on [Dr. Osguthorpe] who allegedly lacked capacity to resist that influence." Rudd/Ballard also assert that "[i]f those allegations were proven, the appropriate remedy would be to invalidate the challenged instruments" in the probate proceeding, not award damages. If Rudd/Ballard were correct in their contention that the Osguthorpe Children's Inheritance Tort Claim had simply and solely sought "a ruling invalidating [Dr. Osguthorpe's] estate plan under the guise of a tort claim against [Dr. Osguthorpe's] lawyers," then we would agree with Rudd/Ballard and the district court that a probate proceeding was the only avenue for relief.

¶105 But the Osguthorpe Children's Inheritance Tort Claim is not so simple. The issues raised in the Osguthorpe Children's Inheritance Tort Claim do not appear to be entirely co-extensive with the issues the Probate Code may remedy. The Osguthorpe Children's claim for intentional interference with inheritance is premised on the following allegations:

> 110. Plaintiffs had a valid expectancy that each would receive property through inheritance upon the death of Dr. D.A. Osguthorpe.
> 111. Rudd, Ballard Spahr and June intentionally interfered with that expectancy through independently tortious conduct, including but not limited to, *undue influence, fraud, and breaches of fiduciary duties*.

112. Absent the tortious interference, Plaintiffs would have received the expectancy and have been directly and proximately injured as a result of the tortious interference, in an amount to be proven at trial, including interest, costs, and attorney fees as allowed by law.

113. The actions by Rudd, Ballard Spahr and June constitute willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and disregard of, the rights of Plaintiffs. Thus, Plaintiffs are entitled to an award of punitive damages against Rudd, Ballard Spahr and June.

(Emphasis added.)

¶106 The Complaint also alleges eight different ways that Rudd/Ballard "violated and failed to perform their fiduciary duties."[27] *See supra* ¶ 34 n.8. Although the Complaint is not a model of clarity, these allegations appear to both support the breach of fiduciary duty cause of action *and* constitute the "independently tortious conduct" the Inheritance Tort requires. While some of these allegations may raise the same issues as those which were or could have been litigated in the Probate Action, some may not.

¶107 To the extent the Complaint alleges that Rudd improperly "coordinat[ed] and engineer[ed] the re-drafting" of the Estate Plan in a way that conflicted with "actual testamentary intent of Dr. D.A. Osguthorpe," such allegations could be addressed and remedied in the Probate Action. In that action, the Osguthorpe Children would have the opportunity to prove that the 2008 Estate Plan documents were the product of Rudd's undue influence, fraud, duress, mistake, or Dr. Osguthorpe's "lack of testamentary intent or capacity." *See* UTAH CODE § 75-3-407(1); *id.* § 75-7-406. And if they could make that showing, they could then attempt to probate the 1998 Estate Plan. *See id.* § 75-3-407(1). In fact, that's the avenue the Osguthorpe Children started to take before filing their Tort Action. *See supra* ¶¶ 29–33.[28]

_____

[27] The Complaint does not delineate which of the alleged breaches fall under Rudd/Ballard's role as attorney and which fall under Rudd's role as trustee of the 2008 Trust.

[28] We reject the Osguthorpe Children's argument that putting a breach of fiduciary duty label on their cause of action automatically exempts it from inclusion in a probate action. The Osguthorpe

(continued . . .)

¶108 But it is not apparent that the Probate Code would displace *all* aspects of the Osguthorpe Children's Claim. To the extent that other allegations underlying the Osguthorpe Children's Inheritance Tort Claim do not contest the redrafting of the Estate Plan, neither the district court nor Rudd/Ballard explain how the Probate Action would provide the Osguthorpe Children a remedy. For example, neither the district court nor Rudd/Ballard explain

---

Children arrive at this conclusion because their probate action alleged undue influence, not breach of fiduciary duty, and because the Probate Code does not list breach of fiduciary duty as one of the available legal theories for contesting a will or voiding a trust. *See* UTAH CODE § 75-3-407(1); *id.* § 75-7-406. The Osguthorpe Children contend they should be able to pursue their breach of fiduciary claim in tort because it has different elements from the undue influence claim available in probate. We reject this argument because it would circumvent the limitations of the Probate Code, which provides the avenues and remedies for contesting wills and trusts that do not reflect the true intent of the testator and enumerates the types of wrongs that may serve as the basis for declaring a will or trust invalid. *See supra* ¶ 71 n.20; *see also* UTAH CODE § 75-3-407(1); *id.* § 75-7-406. As such, even if the Osguthorpe Children slap a "breach of fiduciary duty" label on an allegation that Rudd improperly "coordinat[ed] and engineer[ed] the re-drafting" of the Estate Plan in a way that conflicted with the "actual testamentary intent" of Dr. Osguthorpe, the Osguthorpe Children may not seek to remedy this particular allegation through an Inheritance Tort claim, because questions of Dr. Osguthorpe's testamentary intent can and should be litigated in the Probate Action.

We also reject the Osguthorpe Children's argument that, because the *remedy* they seek here is damages and legal fees, not a different will or trust, their allegation pertaining to the redrafting of the Estate Plan should be allowed to escape the grip of the Probate Code. That argument misses the mark. The Inheritance Tort "is not available to a plaintiff who had a right to seek *a* remedy for the same claim" under Utah's Probate Code, even if not the same remedy. *See* RESTATEMENT (THIRD) TORTS: LIAB. FOR ECON. HARM § 19(2) (emphasis added); *see also id.* § 19 cmt. c ("A proceeding in probate is considered available, for purposes of this Section, even if it offers less generous relief than would be attainable in tort."); *id.* § 19, Reporter's Note cmt. c ("[C]laims in tort are foreclosed by the availability of probate, not by the 'adequacy' of probate.").

how the Probate Action would remedy the claim that Rudd caused Stephen to lose his co-ownership interest in the 19 Acres upon which Stephen's house was located. By way of reminder, Stephen contended that Rudd procured that outcome by making deliberate misrepresentations that caused him to transfer title of the property on which his house sits to an entity in which he had no ownership.[29]

¶109 To be clear, we are not concluding that the Probate Code does or does not provide remedies for the Osguthorpe Children's Inheritance Tort Claim. The Probate Code may provide remedies for some of the allegations underlying their Claim, while leaving the Tort available for other allegations. We are simply concluding that the district court's blanket dismissal of the Osguthorpe Children's Inheritance Tort Claim does not provide us with sufficient information to make that determination. This ambiguity is compounded by the fact that the parties have entered into an agreement that apparently settles some of the claims the Osguthorpe Children brought. But that settlement agreement is not in the record before us. *See supra* ¶ 53 n.14. Therefore, we are unable to sort out the entire universe of claims that are currently in play. We accordingly remand to the district court to make specific determinations on

---

[29] In fact, the district court's 2014 ruling recognized that this particular breach of fiduciary duty allegation is "separate and distinct from issues raised in the Probate Action." The district court therefore allowed that claim to evade the motion to dismiss and to move forward. *See supra* ¶ 39. The court also denied Rudd/Ballard's motion to stay the conversion claim, which is premised on one of the same factual allegations underlying the breach of fiduciary duty claim—that Rudd/Ballard failed to take action to recover the $400,000 June removed from the Osguthorpe Bros. Farms bank account. *See supra* ¶ 34 n.8. The court "conclude[d] that a stay of this claim is not appropriate because the issues presented are separate and distinct from the issues presented in the Probate Action." Because the court concluded that at least some of the Osguthorpe Children's allegations were distinct enough from the Probate Action to move forward, it is difficult to reconcile the court's simultaneous conclusion that these allegations, when characterized as the tortious conduct underlying the Inheritance Tort, would be entirely resolved in the Probate Action.

whether the Probate Code provides remedies for the wrongs the Osguthorpe Children allege.[30]

## II. WE UPHOLD THE DISTRICT COURT'S DISMISSAL AND REJECTION OF ASSIGNMENT OF THE ESTATE CLAIMS

¶110   The Osguthorpe Children also ask us to review the district court's order disposing of the Estate Claims.[31] The district court entered judgment to "enforce its prior ruling and dismiss all of the [Estate] Claims[,] based on the Special Fiduciary's determination that it is not prudent [for the Estate] to pursue those claims." The court then denied the Osguthorpe Children's motion to, in lieu of dismissal, assign the claims to them so they could pursue the claims. The Osguthorpe Children do not contest the Special Fiduciary's determination that it would be imprudent for *him* to pursue the claims on behalf of the Estate. They only appeal the district court's decision to not assign the Estate Claims to them.

¶111 The district court offered four "equally dispositive reasons" for denying the Osguthorpe Children's motion to assign the Estate Claims to them, including that: (A) the requested assignment would "circumvent the Court's prior rulings removing Stephen as Trustee" and barring Stephen's siblings from becoming trustees; (B) assignment of legal malpractice claims and other "claims arising out of the performance of personal services" is impermissible; (C) assignment of a Trust's claims to a beneficiary is impermissible unless the trustee has improperly refused or neglected to bring the

---

[30] Our decision offers no judgment on the ultimate merits of the claims. *Oakwood Vill. LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 8, 104 P.3d 1226. Because the district court's decision was based on a rule 12(b)(6) motion, our decision is based solely on the Complaint's allegations that we must assume are true and draw "all reasonable inferences therefrom in the light most favorable to the plaintiff." *Brown v. Div. of Water Rights of Dep't of Nat. Res.*, 2010 UT 14, ¶ 10, 228 P.3d 747.

[31] The claims at issue in the district court's order were claims brought by Stephen, purportedly on behalf of Dr. Osguthorpe, his Estate, and the Trust, against Rudd/Ballard and June. The claims were for conversion, unjust enrichment, and breaches of fiduciary duty allegedly owed to Dr. Osguthorpe and the Trust. Pursuant to a settlement agreement executed after the district court's ruling, the Osguthorpe Children no longer seek to pursue claims against June.

action; and (D) the assignment would violate "the Special Fiduciary's duties to the Trust and to the other beneficiaries."

¶112 The Osguthorpe Children contest all four of the district court's reasons for denying the assignment, but it is only necessary to uphold the district court on one of them for us to affirm the district court's order.

*A. The District Court Did Not Abuse Its Discretion in Determining that the Assignment Would Impermissibly Circumvent Its Prior Rulings*

¶113 The Osguthorpe Children disagree with the district court's determination that their proposed assignment of the Estate Claims to themselves would "circumvent the court's prior rulings." One of the district court's prior orders had removed Stephen as trustee and barred the other Osguthorpe Children from acting as the Estate's personal representatives due to their "conflicts of interest."[32] We note that the Osguthorpe Children do not directly challenge the district court's determination that the Osguthorpe Children's financial interest in invalidating the 2008 Estate Plan is a conflict of interest that disqualifies them from serving as the Estate's personal representatives.

¶114 Nor do the Osguthorpe Children directly challenge the court's other order determining that Stephen lacked standing to pursue the Estate Claims because the Special Fiduciary is "the real party in interest." That order concluded that, because of Utah Rule of Civil Procedure 17(a), "if the [Estate] Claims are to be pursued, the Special Fiduciary must be a party to this action and he must be the one to fund and direct the [Estate] Claims." The court then gave the Special Fiduciary a deadline to "either move to substitute or join the action as the real party in interest." And the court instructed that

_____

[32] Rudd/Ballard assert that the Osguthorpe Children failed to address this issue in their opening brief and therefore waived their right to address it. This is incorrect. The district court's determination that the assignment would "circumvent its prior rulings" was partially based on its earlier findings that the Osguthorpe Children held "conflicts of interest" with other beneficiaries. The Osguthorpe Children cited this portion of the district court's ruling when they contested the district court's "conflicts of interest" rationale. Therefore, we understand the argument as contesting the foundation of the district court's "circumvention of its prior rulings" rationale, and they did not waive this issue.

"[i]f the Special Fiduciary does not move to substitute or join the action by [the deadline], the Court will dismiss the [Estate] Claims." In other words, this order never gave assignment as an option. The order told the Special Fiduciary to decide whether or not to pursue the claims, and it informed everyone that if the Special Fiduciary opted not to pursue the claims, that would be the end of the line for those claims.

¶115   The Osguthorpe Children's argument on appeal focuses on their assertion that the requested Assignees—Sue Ann, Jerry, and Karen (but not Stephen)—had no "impermissible conflict of interest with any beneficiary of the Estate" which would preclude assignment of the claims against Rudd/Ballard. The Osguthorpe Children further assert that "June's desire that the [Estate] Claims not be pursued against her nephew is insufficient to generate a conflict of interest," and that any potential conflict related to claims against June are no longer at issue because those claims were subsequently settled. We disagree.

¶116   First, it is patently unfair to claim the district court erred because its ruling did not account for the effect of a yet-to-exist settlement agreement. We therefore reject the Osguthorpe Children's contention that a settlement with June subsequent to the district court's decision translates into a ground to reverse the district court's decision to deny assignment based upon its determination that a conflict of interest existed at that time.

¶117   Further, as noted above, the district court previously determined that the Osguthorpe Children have a "significant financial interest" in invalidating the 2008 Estate Plan, and that this constitutes a conflict of interest which disqualifies them from serving as the Estate's personal representative. *See supra* ¶ 113. This makes sense because the 2008 Estate Plan—as the plan created later-in-time and probated first—was presumptively valid under the Trust and Probate Codes upon the establishment of prima facie proof of due execution. *See* UTAH CODE § 75-3-407; *see also Schramm v. Tracy-Collins Bank & Trust Co. (In re Holten's Est.)*, 404 P.2d 27, 29–30 (Utah 1965) (holding that the testatrix's most recent will was presumptively valid and "it is presumed that the testatrix was competent and was acting of her own free will and not under duress or undue influence").

¶118 The Osguthorpe Children's financial interest in invalidating that presumptively valid 2008 Estate Plan is, therefore, inherently in conflict with that Plan. Further, full success on the

breach of fiduciary duty and unjust enrichment claims against Rudd would require proving the invalidity of the 2008 Estate Plan.[33] Therefore, there is a conflict between the 2008 Estate Plan, which is presumed to reflect Dr. Osguthorpe's testamentary intent, and the personal interests of the Osguthorpe Children who wanted to invalidate the 2008 Estate Plan. Moreover, the Probate Code generally forbids trustees and estate representatives from performing "transaction[s] involving the . . . management of trust property" that would involve a "conflict between the trustee's fiduciary and *personal* interests." UTAH CODE § 75-7-802(2) (emphasis added).[34] It was therefore reasonable for the district court to determine that the conflict between the Estate's interests and the Osguthorpe Children's interests disqualified them from serving as estate representatives to prosecute that claim.

¶119 And again, the Osguthorpe Children do not directly contest the district court's ruling that their conflicts of interest disqualified them from serving as estate representatives. Instead, the Osguthorpe Children argue that these conflicts are irrelevant to their proposal to assign the Estate Claims back to them. We agree with the district court that assigning the Estate Claims back to the Osguthorpe Children would "circumvent" the entire reason why the court had removed them from their roles in administering the Estate and had appointed a neutral Special Fiduciary. As the district court explained in denying the assignment, the court "appointed a Special Fiduciary to make these types of decisions on behalf of the Trust and Estate because of numerous conflicts of interest . . . that extended to *all of the Osguthorpe Children*." (Emphasis added.) It was therefore

---

[33] This is because the breach of fiduciary duty claim alleges, in part, that Rudd improperly "coordinat[ed] and engineer[ed] the redrafting" of the Estate Plan in a way that conflicted with the "actual testamentary intent of Dr. D.A. Osguthorpe," and that Rudd/Ballard "receiv[ed] and retain[ed] compensation for legal services rendered in violation of their fiduciary duties." And the unjust enrichment claim appears to be a repetition of the same allegation under a different legal theory. *See supra* ¶¶ 34–35.

[34] We cite the fiduciary duties and standards of care for personal representatives, special administrators, and trustees interchangeably here because a "special administrator . . . has the power of a general personal representative," UTAH CODE § 75-3-617, and a "personal representative is a fiduciary who shall observe the standard of care applicable to trustees . . . ." *Id.* § 75-3-703(1).

within the district court's discretion to determine that assignment of the claims would circumvent its prior ruling which precluded the Osguthorpe Children from representing or administering the Trust and Estate.

¶120 We also agree with the district court that permitting the Osguthorpe Children to fund, direct, and pursue the Estate Claims via assignment in lieu of dismissal would circumvent the court's order that the claims would be dismissed unless the Special Fiduciary determined that pursuit of the claims would be in the Estate's interest and the Special Fiduciary was a "a party to this action" and was "the one to fund and direct" it. *See supra* ¶ 114. The Special Fiduciary recommended against direct pursuit of the claims. *See supra* ¶ 45. And, under the Osguthorpe Children's assignment proposal, the Special Fiduciary would not have been the person to "fund and direct" the litigation. It was therefore within the district court's discretion to determine that the proposed assignment of the Estate Claims would impermissibly circumvent this prior ruling, in addition to its other prior ruling precluding the Osguthorpe Children from serving as estate representatives or trustees. In other words, the district court did not abuse its considerable discretion in concluding that the best path forward was to leave the Special Fiduciary in charge of any potential litigation and to respect the Special Fiduciary's assessment that pursuing the Estate Claims was not in the Estate's best interest.

¶121 Because we uphold at least one of the district court's rationales for denying the Osguthorpe Children's motion to assign the Estate Claims to them, we need not reach the district court's other three grounds. We nevertheless take the opportunity to clarify the law underlying two of the district court's other rationales.

### B. *Utah Law Permits Assignment of Legal Malpractice Claims Absent Policy Concerns Not Present Here*

¶122 The district court concluded that, because "[m]ost of the [Estate] Claims in this action arise from the performance of legal services for Dr. Osguthorpe," and "[c]laims arising from . . . legal services are simply not assignable under Utah law," the Estate Claims are categorically unassignable as a matter of law.[35] The

---

[35] We agree with the district court that the Osguthorpe Children's claims against Rudd/Ballard for breach of fiduciary duty, unjust enrichment, and conversion all arise out of the allegedly improper performance of legal services, and we therefore analyze them as

(continued . . .)

Osguthorpe Children contend the district court erred because, under *Eagle Mountain City v. Parsons Kinghorn & Harris, P.C.*, legal malpractice claims are voluntarily assignable under Utah law in the absence of "clear and compelling public policy" reasons to bar the assignment. 2017 UT 31, ¶ 15, 408 P.3d 322. The Osguthorpe Children further contend that Rudd/Ballard have the burden of demonstrating such policy reasons exist and apply here to bar the assignment, and that Rudd has not met that burden here. We agree with the Osguthorpe Children on this issue and take this opportunity to clarify the law.[36]

1. Legal Malpractice Claims Are Presumptively Assignable After *Eagle Mountain*

¶123 We held in *Eagle Mountain* that "there is a strong presumption that legal malpractice claims are voluntarily assignable," but certain contexts may "present such strong public policy concerns" that assignment of the claims "will be invalidated." 2017 UT 31, ¶¶ 3, 48. The rationale behind this rule is rooted in a "strong presumption of freedom of contract," which also allows contracts to be voided if the contract "violates a clear and compelling public policy" or a "well-defined and dominant policy." *Id.* ¶ 15 & n.7 (citations omitted).

¶124 In definitively holding that legal malpractice claims are presumed voluntarily assignable absent circumstances that clearly violate public policy, we noted that *Snow, Nuffer, Engstrom & Drake v. Tanasse* had "already recognized that the *involuntary* assignment of [legal malpractice] claims . . . does not violate public policy." *Eagle Mountain*, 2017 UT 31, ¶ 16 (citing *Snow, Nuffer, Engstrom & Drake v. Tanasse*, 1999 UT 49, ¶ 13, 980 P.2d 208). We also reiterated that there

---

legal malpractice claims. *See Christensen & Jensen, P.C. v. Barrett & Daines*, 2008 UT 64, ¶ 21, 194 P.3d 931 ("Legal malpractice is a general term used to describe a lawyer's wrongful action or omission that causes injury to a client. 'Clients wronged by their lawyers may sue for damages based on breach of contract, breach of fiduciary duty, or negligence.'" (citations omitted)).

[36] We nevertheless affirm the district court's decision to deny the Osguthorpe Children's proposal to assign the Estate Claims to them, based on the rationale discussed in the prior section. Because we affirm the district court on those other grounds, we need not reach Rudd/Ballard's argument against retroactive application of *Eagle Mountain*.

are strong "public policy interest[s] in allowing access to our courts." *Id.* And we noted that "[o]ur decision in *Snow, Nuffer, Engstrom & Drake v. Tanasse* to uphold the involuntary assignment of legal malpractice claims represents one illustration of a broader movement away from unduly protecting attorneys at the expense of their clients' ability to access the courts." *Id.* ¶ 26. We concluded, "[w]e continue to adhere to that view today." *Id.*

¶125 Therefore, under *Eagle Mountain*, the Osguthorpe Children's claims against Rudd stemming from his allegedly improper legal services were presumptively assignable.

## 2. "Public Policy Concerns" Do Not Categorically Bar Assignment of a Decedent's Legal Malpractice Claims

¶126 Rudd/Ballard next contend that legal malpractice claims in cases such as this—after the potential claimant's death—should be deemed unassignable, based on the public policy grounds discussed in *Eagle Mountain*. Specifically, Rudd/Ballard argue that assignment could cause attorneys to temper their "zealous advocacy" for their client. They also contend that assignment could interfere with attorney-client privilege. *See Eagle Mountain*, 2017 UT 31, ¶ 27.

¶127 With respect to the "zealous advocacy" concern, Rudd/Ballard argue that allowing assignment of a decedent's legal malpractice claims will make lawyers "reluctant" to represent elderly clients in executing or changing estate plans that might "adversely impact" the estate's potential beneficiaries, who are "the very people likely to be assigned the claims against the lawyer after the client's death." We addressed and rejected a similar argument in *Eagle Mountain.* There, we concluded the fears of deterring "zealous advocacy" was "farfetched" and "tenuous," for two reasons. *Id.* ¶ 29 (citation omitted). First, declining to "zealously pursue a client's claims" or interests "out of fear of assignment" of a legal malpractice claim would, in and of itself, "likely be giving the client grounds for bringing a malpractice claim," because it would be an abdication of the requirement in rule 1.3 of the Utah Rules of Professional Conduct to act "with zeal in advocacy upon the client's behalf." *Id.* ¶ 29 (citing UTAH R. PROF'L CONDUCT 1.3 cmt. 1). Second, we concluded that rule 11 of the Utah Rules of Civil Procedure would effectively deter other attorneys from unmeritorious malpractice lawsuits. *Id.* Rudd/Ballard leave us unconvinced that an attorney's relationship with a client who is an elderly testator presents any concern beyond what we rejected in *Eagle Mountain.*

¶128 With respect to attorney-client privilege, Rudd/Ballard acknowledge that, under *Eagle Mountain*, this concern may not be implicated in assignments where it was the *client* who voluntarily assigned the claim. *See id.* ¶¶ 27, 33. But Rudd/Ballard argue that in circumstances where the client does not assign the claim, a client may find her privileged communications discovered without her consent. Although we understand the policy concerns that Rudd/Ballard advance, they are concerns that we have already balanced and decided did not weigh against the assignment of legal malpractice claims. In *Eagle Mountain,* we noted that attorney-client concerns "are just as likely to be implicated when a legal malpractice claim is involuntarily assigned . . . but we have concluded such transfers do not violate public policy as a general matter." *Id.* ¶ 33 (citing *Tanasse*, 1999 UT 49, ¶ 13). We find Rudd/Ballard's arguments no more persuasive than the similar arguments we rejected in *Eagle Mountain*.[37]

### C. Assignment of a Trust's Claims to a Beneficiary May Be Permissible

¶129 The district court also refused to permit assignment of the Estate's claims to the Osguthorpe Children because it understood that Utah law "does not permit *a [trust] beneficiary* to pursue the Trust's claims—either directly *or via assignment*—absent extraordinary circumstances that do not exist here." (Emphases added.) The court further asserted that a trust beneficiary may only pursue a trust's claims if the trustee has *improperly* refused or neglected to bring the action, and that here, the Special Fiduciary *properly* refused to bring the action, thereby precluding an assignment to the Osguthorpe Children.

¶130 Before turning to the merits of this determination, we must first address Rudd/Ballard's argument that the Osguthorpe Children failed to raise this issue in their opening brief and therefore waived their right to appellate review. Ordinarily, if a party fails to raise an issue in the trial court and/or in their opening appellate brief, an appellate court will not reach that issue. *See State v. Johnson*, 2017 UT 76, ¶ 14, 416 P.3d 443.

---

[37] Because of this determination, we need not address the Osguthorpe Children's alternative argument that, even if the claims were unassignable against Rudd in his role as *attorney*, they should be assignable in his role as a *trustee* of the 2008 Trust.

¶131 We agree with Rudd/Ballard that the Osguthorpe Children failed to specifically raise this issue in their opening brief. However, because our preservation and waiver doctrines are "self-imposed," we retain "'wide discretion when deciding whether to entertain or reject' issues that are unpreserved at trial or waived on appeal." *Id.* ¶ 12 (citation omitted). "We retain this discretion to 'balance the need for procedural regularity with the demands of fairness.'" *Id.* (citation omitted). Appellate courts may address a waived issue when:

> 1) the issue was preserved below or if a valid exception to preservation exists, 2) the issue is "astonishingly erroneous but undetected," 3) the losing party would be subject to "great and manifest injustice," and 4) neither party is unfairly prejudiced by raising the issue at that point in the litigation or neither party argues they are unfairly prejudiced.

*Id.* ¶ 49 (citations omitted).

¶132 Even though we agree with the Osguthorpe Children that the district court clearly erred on this sub-issue, Rudd/Ballard will not be subject to any injustice, as we ultimately agree with Rudd/Ballard that the district court did not abuse its discretion in denying the assignment. Further, the Osguthorpe Children preserved this argument below by raising it to the district court during the hearing on their motion to assign the Estate Claims to them,[38] and this issue was part of the district court's decision. Moreover, Rudd/Ballard fully address the issue in their own brief. We also note that the district court's error here is a "purely legal" one that is likely to arise in future cases. *See id.* ¶ 51. We therefore find it prudent to correct the district court's error on this issue.

¶133 The district court held that a trust's claims are categorically unassignable to trust beneficiaries. We disagree. The Trust Code gives trustees discretion to assign claims, so long as that assignment would not violate or circumvent the trustee's duties under the terms of the trust or the Trust Code.

---

[38] The Osguthorpe Children's counsel stated at the hearing: "The law cited by Rudd and Ballard as to whether the assignment would be—should be permitted is [in]apposite because it deals with circumstances in which a beneficiary may pursue a claim directly as opposed to by an assignment."

¶134 The Trust Code provides that "[a] trustee may delegate investment and management functions that a prudent trustee of comparable skills could properly delegate under the circumstances." UTAH CODE § 75-7-814(2). The Trust Code also permits trustees to "sell property. . .;" "release, in whole or in part, a claim belonging to the trust;" and "sign and deliver contracts and other instruments that are useful to achieve or facilitate the exercise of the trustee's powers." *Id.* § 75-7-814(1)(b),(n),(y). Finally, the Trust Code provides that a trustee "may exercise" broad general powers "without authorization by the court," including "powers conferred by the terms of the trust," as well as "all powers over the trust property which an unmarried competent owner has over individually owned property," and "any other powers appropriate to achieve the proper investment, management, and distribution of the trust property," though such powers are "limited by the terms of the trust"[39] and by the "fiduciary duties prescribed by" the Trust Code. *Id.* § 75-7-813.

¶135 We agree with the Osguthorpe Children that the legal authority the district court and Rudd/Ballard cite applies only to situations where the beneficiaries sought to bring a trust's claims *without permission* of a trustee, and therefore, such authority does not control a trustee's *assignment* of claims to a beneficiary. *See Hillcrest Inv. Co., v. Utah Dep't. of Transp.*, 2012 UT App 256, ¶¶ 22–26, 287 P.3d 427; *Anderson v. Dean Witter Reynolds, Inc.*, 841 P.2d 742, 745 (Utah Ct. App. 1992); *In re Voorhees' Est.*, 332 P.2d 670, 672 (Utah 1958); *In re XTO Energy Inc.*, 471 S.W.3d 126, 131–36 (Tex. Ct. App. 2015); *see also* RESTATEMENT (SECOND) OF TRUSTS § 282(1) (AM. L. INST. 1959); RESTATEMENT (THIRD) OF TRUSTS § 107(2)(b) (AM. L. INST. 2012).

---

[39] Here, the terms of the Trusts give the Special Fiduciary authority and discretion to assign claims. The 1998 Trust gives the Trustee "power to . . . *assign* . . . claims held by . . . the Trust Estate." (Emphasis added.) The 2008 Trust provides that the trustee "may," where "reasonably necessary to administer the trust estate," "convey, deliver, *assign*, transfer" property, and "*release powers.*" (Emphases added.) In addition, the court order appointing this Special Fiduciary had granted him "plenary powers [to] evaluate, to manage, and to take care of the Trust and Estate, including all property and assets in the Trust and Estate, so that the Trust and Estate are not wasted. . . . includ[ing] all power and authority granted to a fiduciary under the Trust, the Will of Dr. D.A. Osguthorpe, and the Utah Uniform Probate Code."

¶136 None of these authorities address the question of whether a trustee may voluntarily assign claims to a beneficiary. And, as discussed above, the Trust Code grants trustees discretion to assign a trust's claims so long as that decision would not be otherwise inconsistent with the terms of the trust or trustee's fiduciary duties. Therefore, the district court erred by concluding that a trust's claims are categorically unassignable to trust beneficiaries.

¶137 In sum, even though the district court erred in two of its legal conclusions, the district court nevertheless could properly conclude that assignment of the Estate Claims here was improper. We therefore affirm the district court's determination to deny the Osguthorpe Children's motion to assign the Estate claims to them.

### III. THE DISTRICT COURT ERRED IN EXCLUDING A REDACTED VERSION OF RUDD'S AFFIDAVIT

¶138 The district court granted Rudd's motion *in limine* to prevent the admission of an affidavit Rudd provided in connection with a motion to set aside the First Settlement Agreement. The parties inked that agreement after participating in mediation.

¶139 The Osguthorpe Children sought to impeach Rudd's credibility with what they contend are "patently false" statements in the affidavit. The district court granted Rudd's motion to exclude the affidavit—even a redacted version—on the grounds that it was "related to" or a "reference to the parties' mediation or the mediation agreement." The district court therefore excluded any use of the affidavit because "[s]uch evidence is excluded pursuant to Rule 401–403 and 408 of the *Utah Rules of Evidence* and Utah Code § 78B-10-104." At the hearing on this matter, the court reasoned that "[t]his seems to be in defense of the mediation agreement and, therefore, I will accept the representation [by Rudd/Ballard's counsel] that to allow this in would open up . . . further mediation evidence."

¶140 We agree with the Osguthorpe Children that the district court exceeded its discretion by barring the affidavit under Utah Code section 78B-10-104 of the Utah Uniform Mediation Act ("Mediation Act") and rule 408 of the Utah Rules of Evidence.

¶141 First, Section 104 of the Mediation Act does not provide a basis to exclude the entire affidavit. Section 104 provides, in pertinent part, that "a mediation communication is privileged . . . and is not . . . admissible in evidence in a proceeding . . . ." UTAH CODE § 78B-10-104(1). The Mediation Act defines "mediation communication" as "a statement . . . that occurs during a mediation

or is made for purposes of considering, conducting, participating in, initiating, continuing, or reconvening a mediation or retaining a mediator." *Id.* § 78B-10-102(2). As the Osguthorpe Children note, the affidavit was not made "*during* a mediation," nor was it made "for purposes of *considering, conducting, participating in, initiating, continuing, or reconvening* a mediation or retaining a mediator." *See id.* (emphases added). Rather, the Affidavit was filed in support of *setting aside* an agreement from a previously concluded mediation. Therefore, the affidavit itself was not a filing subject to section 104.

¶142   To the extent the affidavit reflected the substance of mediation communications, the Osguthorpe Children proposed offering a redacted version that only revealed the statements they wanted to use. Specifically, the Osguthorpe Children sought to use at trial the following statements: (i) "I have never represented the Osguthorpe Parties, including Stephen Osguthorpe or Jerry Osguthorpe"; (ii) "I was not involved in D.A. Osguthorpe's decision to amend and/or restate the 2008 Restated Trust, and, therefore, did not write myself into D.A. Osguthorpe's estate plan"; (iii) "I was not involved in any discussions or negotiations related to any deal and/or a gift to CSU or CSUF. Prior to the death of D.A. Osguthorpe, I was unaware of any such gift and unaware of where the funds for such a gift would come from. . . . As previously stated, I was not involved in D.A. Osguthorpe's estate plan . . . I did not, however, draft any of the terms of the estate plan or terms contained in the trust and/or employ straw-men scriveners to do so"; and (iv) "I also affirmatively deny . . . that I attempted to benefit myself financially." None of those statements fall within the Mediation Act's definition of a mediation statement. *See* UTAH CODE § 78B-10-102(2). The district court erred in granting the motion *in limine* on that basis.

¶143   Utah Rule of Evidence 408 also does not provide a basis to exclude the affidavit. Rule 408 provides that "[e]vidence of" "conduct or a statement made in compromise negotiations" "is not admissible either to prove or disprove liability for or the validity or amount of a disputed claim." UTAH R. EVID. 408(a)(2). But the portion of Rudd's affidavit that the Osguthorpe Children sought to use did not reveal statements made "*in* compromise negotiations." *Id.* (emphasis added). Further, even if the Affidavit were made "*in* compromise negotiations," rule 408 permits a court to admit such evidence if its use is *not* to "prove or disprove liability" but rather is "for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." *Id.* 408(a), (b)(1).

The Osguthorpe Children sought to use the statements in the affidavit for another purpose: impeaching Rudd's testimony.[40] Simply stated, the district court erred by concluding that rule 408 dictated the grant of the motion *in limine*.

¶144 We also disagree with Rudd/Ballard's alternative argument that admission of the affidavit should be barred under section 208 of the Utah Alternative Dispute Act, which provides that "[n]o evidence concerning the fact, conduct, or result of an ADR [Alternative Dispute Resolution] proceeding may be . . . admissible at any subsequent trial of the same case or same issues between the same parties." UTAH CODE § 78B-6-208(2). The portions of the redacted affidavit that the Osguthorpe Children seek to admit do not concern the "fact, conduct, or result" of the mediation, but instead, as the Osguthorpe Children note, only "reference factual events occurring years before the litigation" and the mediation. *Cf. supra* ¶ 142. We agree with the Osguthorpe Children that these statements in their redacted form "stand alone," and Rudd would have the opportunity to respond without referring to the mediation. Therefore, to the extent the district court considered and agreed with this Utah Alternative Dispute Act argument as a basis for its exclusion of the Affidavit, that decision would be erroneous and an abuse of discretion.[41]

---

[40] We note that the federal analog to this rule expressly prohibits the use of a "statement made during compromise negotiations" if the purpose is to "impeach by a prior inconsistent statement or a contradiction." FED. R. EVID. 408(a)(2). Our rule 408 does not contain that prohibition.

[41] Rudd/Ballard also urge us not to rule on this issue at all because, they contend, the trial "may never occur" and therefore the issue is not ripe. We disagree. As we explained in *Bodell Const. Co. v. Robbins*,

> A dispute is ripe "when 'a conflict over the application of a legal provision [has] sharpened into an actual or imminent clash of legal rights and obligations between the parties thereto.'" An issue is not ripe for appeal if "there exists no more than a difference of opinion regarding the hypothetical application of [a provision] to a situation in which the parties might, at some future time, find themselves."

(continued . . .)

¶145 Finally, the district court also abused its discretion in excluding the affidavit in its entirety under rules 401, 402, and 403 of the Utah Rules of Evidence. "Relevant evidence is presumptively admissible" under rule 402. *State v. Richardson*, 2013 UT 50, ¶ 24, 308 P.3d 526. Rule 402 provides that "[r]elevant evidence is admissible" unless otherwise excluded under a statute, rules applicable in courts of this state, or the constitutions of the United States or Utah. UTAH R. EVID. 402. Rule 401 broadly defines "relevant" evidence as evidence that "has *any tendency* to make a fact [of consequence] more or less probable than it would be without the evidence." *Id.* 401 (emphasis added). "Together these rules establish a 'very low' bar that deems 'even evidence with the slightest probative value' relevant and presumptively admissible." *Richardson*, 2013 UT 50, ¶ 24 (quoting *State v. Martin*, 2002 UT 34, ¶ 34, 44 P.3d 805).

¶146 We agree with the Osguthorpe Children that the affidavit was relevant under rule 401. The statements in the affidavit that the Osguthorpe Children seek to use are relevant both to the substance of the claims and the credibility of Rudd, who was expected to be a key witness at trial on those claims. The statements pertain to whether Rudd had represented the Osguthorpe Children, had been involved in Dr. Osguthorpe's decision to amend his trust in 2008, or had been involved in discussions relating to gifts to CSU or CSUF. *See supra* ¶ 142. These statements relate to facts of consequence underlying both the Estate Claims and the Osguthorpe Children' Inheritance Tort Claim, which are premised on allegations that Rudd played an improper role as attorney and trustee in the drafting of the 2008 Estate Plan and in handling other Estate-related matters.

¶147 Further, Rudd's credibility, and the affidavit's potential to undermine Rudd's credibility, would be important in establishing or disproving those facts of consequence because Rudd's testimony at trial was expected to be key to his defense. "Evidence that is not directly relevant to the issues in the case, but that may shed light on the credibility of a witness, does have probative value." *State v. Miranda*, 2017 UT App 203, ¶ 35, 407 P.3d 1033 (citing *State v.*

_____

2009 UT 52, ¶ 29, 215 P.3d 933 (alteration in original) (citation omitted). Here, because we reverse and remand the district court's dismissal of the Osguthorpe Children's tortious interference with inheritance claim, there is a potential for trial on these issues. The Osguthorpe Children are entitled to have us review a decision that could impact the litigation on remand. *See id.* ¶ 33.

*Fairbourn*, 2017 UT App 158, ¶ 44, 405 P.3d 789; *State v. Calliham*, 2002 UT 87, ¶ 38, 57 P.3d 220 (stating that "[w]hether or not these witnesses were credible was a fact of consequence in considering whether [the defendant] was guilty")). The affidavit therefore met our broad standards for relevance, and the district court erred in concluding that rule 401 supported exclusion of the affidavit.

¶148   The district court also unreasonably determined that rule 403 supported wholesale exclusion of the affidavit. As an initial matter, although the parties briefed the rule 403 question, it appears that the court was not focused on that argument. At the hearing on Rudd's motion *in limine* on this matter, the court said: "The real issue here is[,] is it part of this mediation or not." The court later concluded, "[t]his seems to be in defense of the mediation agreement and, therefore, I will accept the representation [by Rudd/Ballard's counsel] that to allow this in would open up . . . further mediation evidence." And while we ordinarily allow trial courts "considerable freedom in applying [rule 403] to the facts," we may reverse the trial court's ruling if we find it was "beyond the limits of [reasonableness]." *State v. Boyd*, 2001 UT 30, ¶ 40, 25 P.3d 985 (alterations in original) (citations omitted).

¶149   Rule 403 permits the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." UTAH R. EVID. 403. The court offered no insight in its written decision as to the rationale behind its ruling. As such, to the extent the court's decision was premised on rule 403, we reverse it because we have no visibility into the basis for that decision. We leave open, however, the possibility that it could revisit its rule 403 decision on remand.

¶150 Because the district court's decision to exclude the affidavit centered on erroneous interpretations of rules and statutes, we reverse the district court's grant of the motion *in limine*.

## CONCLUSION

¶151   The district court erred in concluding that a plaintiff in Utah may never assert a claim for intentional interference with inheritance. We therefore reverse the district court's dismissal of the claim. We uphold the district court's decision to not assign the Estate Claims to the Osguthorpe Children. And we reverse the district court's grant of the motion *in limine* preventing the use of a redacted version of Rudd's affidavit.